**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| IBRAHIM FARHAB BARE,<br>*Petitioner*,<br><br>v.<br><br>WILLIAM P. BARR, Attorney General,<br>*Respondent.* | No. 17-73269<br><br>Agency No.<br>A073-436-746<br><br>OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted August 7, 2019
San Francisco, California

Filed September 16, 2020

Before:  Diarmuid F. O'Scannlain, Eugene E. Siler,* and
Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Siler

---

*The Honorable Eugene E. Siler, United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

## SUMMARY[**]

### Immigration

Denying Ibrahim Bare's petition for review of a decision of the Board of Immigration Appeals, the panel held that: 1) the BIA did not err in concluding that Bare's conviction for being a felon in possession of a firearm or ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(A)(2), constitutes a particularly serious crime barring withholding of removal; and 2) the IJ lacked jurisdiction to consider Bare's request for adjustment of status in "asylum-only" proceedings.

Bare, a native and citizen of Somalia, came to the United States as a stowaway, was placed in "asylum-only" proceedings for stowaways, and was granted asylum in 1997. Asylum-only proceedings are limited to determining eligibility for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). An IJ later granted the government's motion to reopen in order to terminate Bare's asylum grant based on his conviction. The IJ determined that he lacked jurisdiction to consider Bare's request for an adjustment of status, and denied withholding of removal and CAT relief. The BIA affirmed.

As a preliminary matter, the panel concluded that Bare exhausted his challenges related to the first factor of the test for whether a crime is particularly serious. The panel next concluded that the BIA did not abuse its discretion in

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

concluding that Bare's conviction for being a felon in possession of a firearm was a particularly serious crime barring withholding of removal. First, the panel rejected Bare's contention that the agency erred by not explicitly considering the elements of the offense, concluding that the agency's analysis was sufficient under the circumstances. Second, the panel rejected Bare's contention that the crime is a "status offense" and is, therefore, categorically excluded from being particularly serious. The panel noted that it would be anomalous if a conviction for the offense where the sentence is less than five years' imprisonment was categorically excluded from being a particularly serious crime, but where the sentence is five years' imprisonment or more, is defined as per se particularly serious by statute. Third, the panel concluded that it was proper for the IJ to consider the circumstances in which Bare came into possession of the relevant firearms, the effect of his business on the community, and other acts going to his mental state.

Next, the panel concluded that the IJ lacked jurisdiction to consider Bare's request for adjustment of status because Bare was in "asylum-only" proceedings. Bare argued that he lost his status as a stowaway when granted asylum and, therefore, reopening his asylum-only proceedings was improper; instead, he should have been in removal proceedings under § 240 of the Immigration and Nationality Act, in which an IJ can grant adjustment of status.

The panel first concluded that Bare's grant of asylum did not terminate his stowaway status, explaining that the plain meaning of the statute and the statutory context make clear that a stowaway retains stowaway status when granted asylum. The panel next concluded that, because Bare retained his stowaway status, there was no bar to reopening his asylum-only proceeding to terminate asylum, and further

explained that regulations allow asylum to be terminated by reopening a case, and the case to be reopened here was Bare's asylum-only proceeding.

The panel also rejected Bare's contention that, even in asylum-only proceedings, he should have been able to apply for adjustment. The panel explained that allowing the IJ to consider that request would contradict the limits on asylum-only proceedings, and is unnecessary because Bare has another avenue to seek adjustment. Specifically, the panel explained that Bare met all the requirements to apply for adjustment, provided that he also sought and received a waiver, but that the application should have been made to the United States Citizenship and Immigration Service, which retains the authority to consider his request.

## COUNSEL

Kari E. Hong (argued), Boston College Law School, Newton, Massachusetts, for Petitioner.

Michael C. Heyse (argued), Acting Senior Litigation Counsel; Mary Jane Candaux, Assistant Director; Joseph H. Hunt, Assistant Attorney General; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

# OPINION

SILER, Circuit Judge:

Ibrahim Farhab Bare, a native and citizen of Somalia, petitions for review of a decision of the Board of Immigration Appeals ("BIA") dismissing his appeal. Bare came to the United States as a stowaway in 1996, requested asylum, and was placed in "asylum-only" proceedings before an immigration judge ("IJ"). Bare was granted asylum in 1997. Over a decade later, the government moved to reopen Bare's asylum-only proceeding to terminate his grant of asylum based on his conviction for being a felon in possession of a firearm or ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).[1] The IJ granted the motion and reopened Bare's asylum-only proceeding. In the reopened proceeding, Bare requested to adjust his status to that of a lawful permanent resident, but the IJ refused to consider his request, reasoning that an IJ in asylum-only proceedings lacks jurisdiction to adjust status. Bare then requested a continuance to allow him to apply for an adjustment of status with the United States Citizenship and Immigration Services ("USCIS"). The IJ terminated Bare's asylum without addressing his continuance request. The IJ then denied Bare's request for withholding of removal, finding that his conviction constituted a particularly serious crime making him ineligible for it. Finally, the IJ denied Bare's requests for withholding and deferral of removal under the Convention Against Torture ("CAT"). Bare appealed to the BIA, which affirmed the IJ's decision.

---

[1] For simplicity, we will omit "or ammunition" when referring to Bare's conviction throughout this opinion.

Bare now petitions for review of the BIA's order affirming the IJ's findings and decision, arguing that the BIA and IJ erred in two conclusions: (1) that his firearm conviction constitutes a particularly serious crime; and (2) that the IJ lacked jurisdiction to consider his request for an adjustment of status. The government contends that Bare has not exhausted his particularly serious crime argument. However, we conclude that Bare has adequately exhausted his particularly serious crime argument but the BIA and IJ did not err in concluding that his firearm conviction constitutes a particularly serious crime, thus making him ineligible for withholding of removal. The termination of Bare's grant of asylum by reopening his asylum-only proceeding was not error, and the IJ did not have jurisdiction to consider Bare's request for an adjustment of status because of the limited scope of such proceedings. Bare's request for an adjustment of status should have been made to the USCIS, not the IJ. Therefore, we deny review.

## I.

## A.

Bare entered the United States in 1996 at the age of seventeen as a stowaway aboard a ship. He requested asylum and was placed into "asylum-only" exclusion proceedings. An IJ granted Bare asylum in 1997. Over the next fifteen years, Bare lived as an asylee in the United States, but never applied for an adjustment of status to become a lawful permanent resident. During this time, Bare entered into a relationship with a woman, whom he considers his common-law wife, and they have two children together. His wife has another child from a previous relationship whom Bare identifies as his stepson. While an asylee, Bare had three felony convictions prior to his conviction at issue

here: possession of burglary tools in 2000 and resisting arrest in both 2001 and 2002.

In 2009, Bare and his wife moved to Whippoorwill, Arizona, a small community deep in the Navajo Nation. Shortly thereafter, Bare began operating an unlicensed pawnshop out of his home, where he also sold alcohol and drugs. His pawnshop dealt in firearms as well, which is how he came into possession of the firearms he was convicted of possessing. Not surprisingly, Bare's business attracted trouble for this quiet, rural community. There was an influx of vandalism, crime, violence, and unsavory characters. During his time in Whippoorwill, there was a series of incidents where Bare exhibited aggressive and threatening behavior toward others, including children: he verbally berated a child at his daughter's school, he boarded a school bus full of middle-school students and cursed and threatened them with violence, he pointed a rifle at a teenager and threatened to kill him for allegedly stealing a television from him, and he was part of a group that beat a teenager with a baseball bat.

The incident leading to the revocation of Bare's asylum occurred at his house in 2012. One night, a neighbor upset about a pawn transaction came to Bare's house. Bare and his children were sleeping in the house, so his wife answered the door. An argument ensued which woke up Bare, who joined in. The situation escalated when Bare pointed a pistol at the unarmed neighbor. As the neighbor left, Bare fired the pistol into the air. The police later recovered the pistol and five rounds of ammunition from Bare's house. As a result, Bare was charged with being a felon in possession of a firearm.

Federal agents went to Bare's home with an arrest warrant a month later, after he failed to appear in court.

Inside the house agents found two rifles and hundreds of rounds of ammunition of various calibers.

Bare was convicted by a jury of two counts of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  He was eventually sentenced to 54 months' imprisonment.  *See United States v. Bare*, 806 F.3d 1011, 1015–17 (9th Cir. 2015) (discussing the appellate history of the case and upholding the 54-month sentence).

## B.

As a result of his conviction, the Department of Homeland Security ("DHS") filed a motion with the IJ to reopen Bare's asylum-only proceeding from 1997 to terminate his grant of asylum.  The IJ granted the government's motion to reopen the proceeding.  In the proceeding, Bare applied to the IJ for an adjustment of status, but the IJ concluded that he did not have the authority to consider it because Bare was in a reopened asylum-only proceeding and, in asylum-only proceedings, an IJ cannot consider requests for an adjustment of status.  Bare then requested the IJ defer a decision on whether to terminate his asylum in order to allow him time to apply for an adjustment of status with the USCIS.  The IJ terminated Bare's asylum status without ruling on, or mentioning, his pending continuance request.  Next, the IJ denied Bare's request for withholding of removal, finding that his firearm conviction was a particularly serious crime which made him ineligible for withholding of removal.  Finally, the IJ denied Bare's request for withholding and deferral of removal under the CAT.  After the hearing, the IJ denied Bare's motion to reconsider his continuance request to allow him to apply to USCIS for an adjustment of status.

The BIA affirmed the IJ's decision, finding that (1) the IJ did not have jurisdiction over his adjustment of status request and (2) Bare's firearm conviction was a particularly serious crime, barring withholding of removal. Bare now seeks review of the BIA's order affirming the IJ's findings and decision.

## II.

We have jurisdiction pursuant to 8 U.S.C. § 1252(a)(1). To the extent the BIA's decision arises from asylum-only proceedings, the BIA's denial of Bare's appeal is the functional equivalent of a final order of removal. *See Bao Tai Nian v. Holder*, 683 F.3d 1227, 1230 (9th Cir. 2012).

### A.

### 1.

As a preliminary matter, the government contends that we lack jurisdiction over Bare's specific argument that his firearm conviction is a status offense and cannot be a particularly serious crime because he failed to exhaust the argument by adequately raising the issue before the BIA. We disagree.

Exhaustion requires a non-constitutional legal claim to the court on appeal to have first been raised in the administrative proceedings below, *Barron v. Ashcroft*, 358 F.3d 674, 678 (9th Cir. 2004), and to have been sufficient to put the BIA on notice of what was being challenged, *Alvarado v. Holder*, 759 F.3d 1121, 1128 (9th Cir. 2014). A petitioner must do more than make a "general challenge to the IJ's decision." *Zara v. Ashcroft*, 383 F.3d 927, 930 (9th Cir. 2004). But this does not require the issue to have been raised in a precise form during the

administrative proceeding. *Vizcarra-Ayala v. Mukasey*, 514 F.3d 870, 873 (9th Cir. 2008); *see Diaz-Jimenez v. Sessions*, 902 F.3d 955, 959 (9th Cir. 2018) ("We do not employ the exhaustion doctrine in a formalistic manner." (quoting *Ren v. Holder*, 648 F.3d 1079, 1083 (9th Cir. 2011))). Rather, the petitioner may raise a general argument in the administrative proceeding and then raise a more specific legal issue on appeal. *See Moreno-Morante v. Gonzales*, 490 F.3d 1172, 1173 n.1 (9th Cir. 2007). What matters is that the BIA was sufficiently on notice so that it "had an opportunity to pass on this issue." *Zhang v. Ashcroft*, 388 F.3d 713, 721 (9th Cir. 2004) (per curiam).

In his brief to the BIA, Bare argued that "the IJ failed to consider the appropriate factors and relied on improper evidence in making the particular[ly] serious determination." The government contends that this was insufficient to put the BIA on notice that he was challenging the IJ's failure to address the first factor of the test used to determine if a crime is particularly serious. Bare's contention in his brief to the BIA was that the IJ "failed to consider the appropriate factors." There are only three factors. *See Flores-Vega v. Barr*, 932 F.3d 878, 884 (9th Cir. 2019) (noting that, although there were four factors, the fourth factor no longer requires an independent inquiry). Bare's brief to the BIA also argued that the IJ erred when considering the third factor by improperly weighing evidence, so that cannot be the factor that Bare claims the IJ "failed to consider." The IJ in his written opinion explicitly noted the second factor, but did not explicitly consider the first factor. Thus, when considered in the context provided by the IJ's written decision, Bare's brief gave the BIA sufficient notice that he was challenging the IJ's failure to consider the first factor.

The government also contends that Bare's argument was too general to put the BIA on notice of his specific argument that being a felon in possession of a firearm is a "status offense" and thus cannot be a particularly serious crime because it necessarily fails the first factor.

We have previously found exhaustion in cases where the argument to the BIA was more general than the argument made to the BIA here. *See, e.g.*, *Moreno-Morante*, 490 F.3d at 1173 n.1 (finding a grandfather's general claim before the BIA that he was the de facto parent of his two grandchildren constituted administrative exhaustion of his later specific statutory argument that his grandchildren came within the definition of "child" in the applicable statute); *Zhang*, 388 F.3d at 721 (finding administrative exhaustion where the petitioner's brief to the BIA merely stated that he was seeking reversal of IJ's denial of relief under the CAT, but did not include any legal arguments or provide a specific basis on which he was challenging the IJ's CAT determination). Therefore, the BIA was sufficiently on notice and Bare exhausted his legal claims before the BIA, so we have jurisdiction.

**2.**

"Pursuant to 8 U.S.C. § 1252(a)(2)(B)(ii), we 'lack jurisdiction over the BIA's ultimate determination that [Bare] committed a particularly serious crime.'" *Flores-Vega*, 932 F.3d at 884 (quoting *Anaya-Ortiz v. Holder*, 594 F.3d 673, 676 (9th Cir. 2010)). "But we retain jurisdiction to 'determine whether the BIA applied the correct legal standard.'" *Id.* (quoting *Anaya-Ortiz*, 594 F.3d at 676). We review for an abuse of discretion. *See Arbid v Holder*, 700 F.3d 379, 385 (9th Cir. 2012) (per curiam). Under the abuse-of-discretion standard, we may reverse the BIA's decision only if the BIA acted "arbitrarily,

irrationally, or contrary to law." *Id.* (quoting *Singh v. INS*, 213 F.3d 1050, 1052 (9th Cir. 2000)). Our review is "limited to ensuring that the agency relied on the 'appropriate factors' and '[]proper evidence' to reach this conclusion." *Avendano-Hernandez v. Lynch*, 800 F.3d 1072, 1077 (9th Cir. 2015) (alteration in original) (quoting *Anaya-Ortiz*, 594 F.3d at 676).

With several exceptions, an alien is entitled to withholding of removal where "the alien's life or freedom would be threatened in [the country of removal] because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). One exception is when the alien has been convicted of a "particularly serious crime." *Id.* § 1231(b)(3)(B)(ii). There are two ways in which a crime can be a particularly serious crime: (1) an aggravated felony resulting in an aggregate sentence of imprisonment of at least five years is per se a particularly serious crime, or (2) the Attorney General may "designate offenses as particularly serious crimes through case-by-case adjudication as well as regulation," *Delgado v. Holder*, 648 F.3d 1095, 1098 (9th Cir. 2011) (en banc). *See* 8 U.S.C. § 1231(b)(3)(B)(iv). Since Bare received less than five years' imprisonment, our inquiry is under the latter category.

In *In re Frentescu*, 18 I. & N. Dec. 244, 247 (B.I.A. 1982), the BIA developed a multi-factor test to determine on a case-by-case basis whether a crime is particularly serious. Subsequent cases have altered and refined the analysis. *See In re N-A-M-*, 24 I. & N. Dec. 336, 342 (B.I.A. 2007), *overruled in part on other grounds by Blandino-Medina v. Holder*, 712 F.3d 1338, 1347–48 (9th Cir. 2013). The factors to be considered are: (1) "the nature of the conviction," (2) "the type of sentence imposed," and (3) "the

circumstances and underlying facts of the conviction." *Id.* The nature of the conviction is examined by looking at the elements of the offense. *Id.* This factor serves a gatekeeping function: "If the elements of the offense do not potentially bring the crime into a category of particularly serious crimes, the individual facts and circumstances of the offense are of no consequence," the analysis stops at the first factor, and the alien is not barred from withholding of removal. *Id.* If, however, "the elements of the offense are examined and found to potentially bring the offense within the ambit of a particularly serious crime," then the other factors are considered. *Id.* In considering the second and third factors, "all reliable information may be considered . . . including the conviction records and sentencing information, as well as other information outside the confines of a record of conviction." *Id.*

Here, the BIA affirmed the IJ's determination that Bare's conviction was a particularly serious crime, precluding his eligibility for withholding of removal. Bare challenges this determination on three grounds. First, he argues that the crime of being a felon in possession of a firearm is a "status offense" whose elements do not potentially bring it within the category of particularly serious crimes. Second, he argues that the IJ and the BIA erred by not considering the first *Frentescu/N-A-M-* factor. And third, he argues that, in analyzing the third factor, the IJ and BIA erred by considering impermissible facts and failing to give adequate weight to other, permissible facts.

**i.**

Bare argues that the IJ and BIA erred by skipping over the first *Frentescu/N-A-M-* factor and not explicitly conducting an analysis of it before moving on to the other factors. Because the BIA adopted and affirmed the IJ's

reasoning, and also contributed its own reasoning to the analysis, we review both decisions. *Zhi v. Holder*, 751 F.3d 1088, 1091 (9th Cir. 2014). In their written decisions, the IJ and BIA both discussed the correct standard—the *Frentescu/N-A-M-* factors—for determining if a crime is particularly serious. In particular, the IJ emphasized the requirement that reviewing the elements of the offense occurs first, and only if the elements of the offense potentially bring the offense within the ambit of a particularly serious crime is the IJ to consider the other factors. The BIA found that the IJ "properly arrived" at the particularly serious crime determination and noted that the IJ had considered the nature of the conviction. Neither the IJ nor the BIA listed the elements of felon in possession of a firearm in their written decisions, neither explicitly discussed the elements of the crime, and neither explicitly stated that the crime is potentially particularly serious.

The IJ and BIA correctly noted that Bare had been convicted of being a felon in possession of a firearm. As an aggravated felony, his conviction is one of the types of crimes "most likely to be" particularly serious. *Guerrero*, 908 F.3d at 545 (quoting *Alphonsus*, 705 F.3d at 1043). Unlike some state crimes—where it frequently is not obvious on its face what the crime actually is, what the elements are, or what an analogous federal offense would be (if there even is one)—felon in possession of a firearm is a straightforward, well-known federal crime with simple elements. *Cf. Hernandez-Vasquez v. Holder*, 430 F. App'x 448, 452–53 (6th Cir. 2011) (considering the wide variety of crimes that fall under Ohio's felony child endangerment statute to determine which of them the alien had been convicted of and what the elements of that variant of the crime were); *N-A-M-*, 24 I. & N. Dec. at 343 (examining the elements of Colorado's felony menacing statute). Although

the IJ did not analyze the elements of felon in possession of a firearm in isolation, he referenced facts that went directly to each element in his analysis as supporting the conclusion that Bare's conviction constitutes a particularly serious crime:  Bare "possessed a firearm," which he obtained "as a result of his pawn shop operation," he "had already been convicted of a felony," and he knew he was not allowed to possess a firearm because he "hid the gun in a bag of dog food to avoid having the authorities find it."  *See United States v. Benamor*, 937 F.3d 1182, 1186 (9th Cir. 2019) ("To convict someone under § 922(g)(1), the government must prove four elements: (1) the defendant was a felon; (2) the defendant knew he was a felon; (3) the defendant knowingly possessed a firearm or ammunition; and (4) the firearm or ammunition was in or affecting interstate commerce."). Similarly, the BIA noted that Bare "fired a gun . . . which he illegally possessed."   Therefore, where the crime is a common federal crime with simple and straightforward elements and is an aggravated felony, the maximum possible sentence for the crime is more than five years' imprisonment, and the IJ or BIA noted facts which correspond to all the elements of the offense as weighing in favor of the crime being particularly serious, we see no reason to put form over substance.   Under these circumstances, we will not require an explicit consideration of the elements of the offense.

Bare directs our attention to *Luziga v. Attorney General*, 937 F.3d 244, 253–54 (3d Cir. 2019), where the Third Circuit found that the IJ skipping over the first *N-A-M-* factor was error and remanded to the BIA to apply the first *N-A-M-* factor to determine whether the elements of the petitioner's conviction potentially fall within the ambit of a particularly serious crime.  There, the IJ not only "skipp[ed] right over the preliminary consideration of elements," but also "made

no reference to the elements of [the petitioner's] offense." *Id.* at 253–54. And further, while the BIA claimed to consider the elements in its opinion, it "listed as 'elements' specific offense characteristics such as loss amount" which were not elements of the offense. *Id.* at 254. Here, however, the IJ and BIA did not erroneously claim that non-elements were elements and the IJ referenced facts going to all the elements of the crime and found that they pointed in favor of its being particularly serious. Therefore, we do not find an abuse of discretion under these circumstances.

## ii.

Bare next contends that the crime of felon in possession of a firearm is a "status offense" not involving an element of violence, endangerment, recklessness, injury, or use of a weapon and is, therefore, categorically excluded from being a particularly serious crime because it necessarily fails the first *Frentescu/N-A-M-* factor. Our review is limited to whether it is an abuse of discretion for the BIA to conclude that being a felon in possession of a firearm can ever be a particularly serious crime where the sentence is less than five years' imprisonment. *See Arbid*, 700 F.3d at 385.

The first *Frentescu/N-A-M-* factor requires only that the elements of the offense "*potentially* bring the offense within the ambit of a particularly serious crime." *N-A-M-*, 24 I. & N. Dec. at 342 (emphasis added). This determination is made without regard to the individual facts or circumstances in the case, but only by reviewing the elements of the crime. *Id.* Thus, this factor's inquiry is whether—under any factual circumstances—the offense could be a particularly serious crime or whether it is so minor that it is categorically excluded from being particularly serious.

In considering the elements of an offense, the BIA is to "place the alien's conviction along a spectrum of seriousness." *Guerrero v. Whitaker*, 908 F.3d 541, 544 (9th Cir. 2018). On one end of the spectrum, we have previously used a "minor traffic infraction" as an example of a crime that would per se not be a particularly serious crime. *Id.* On the other end, we have used a "heinous, violent crime" as an example of a crime that would be particularly serious under any factual circumstances. *Id.* Between these two extremes, a review of cases demonstrates that it is a low standard for a crime to potentially be a particularly serious crime. We have previously upheld a decision by the BIA that mail fraud can constitute a particularly serious crime. *Arbid*, 700 F.3d at 385. Other circuits have upheld the BIA's determination that a variety of crimes can constitute particularly serious crimes, including: aggravated identity theft, *Valerio-Ramirez v. Sessions*, 882 F.3d 289, 299–300 (1st Cir. 2018); evidence tampering, *Denis v. Att'y Gen.*, 633 F.3d 201, 216 (3d Cir. 2011); securities fraud, *Kaplun v. Att'y Gen.*, 602 F.3d 260, 267–68 (3d Cir. 2010); and reckless endangerment, *Nethagani v. Mukasey*, 532 F.3d 150, 155 (2d Cir. 2008). In attempting to delineate the other side of the boundary—crimes that are per se excluded from being particularly serious crimes—Bare points to no case, and we are unable to find any, in which a court concluded that a particular felony is per se not particularly serious.

We have also previously recognized that the statute treating aggravated felonies which result in imprisonment for at least five years as per se particularly serious crimes suggests that aggravated felonies are "the types of crimes most likely to be [particularly serious crimes] even when the aggregate sentence is less than five years." *Guerrero*, 908 F.3d at 545 (quoting *Alphonsus v. Holder*, 705 F.3d 1031, 1043 (9th Cir. 2013)). Because felon in possession of a

firearm is an aggravated felony, *see* 8 U.S.C. § 1101(a)(43)(E)(ii), we would expect it to fall toward the more serious end of the spectrum and be among "the types of crimes most likely to be" particularly serious crimes under the *Frentescu/N-A-M-* analysis. *Guerrero*, 908 F.3d at 545. It would be anomalous if a conviction for being a felon in possession of a firearm where the sentence is less than five years' imprisonment was categorically excluded from being a particularly serious crime, but where the sentence is five years' imprisonment or more, it is per se particularly serious. We, therefore, conclude that it is not an abuse of discretion to conclude that the crime of being a felon in possession of a firearm can potentially be particularly serious.

### iii.

Finally, Bare argues that, even if the first factor is met, the BIA erred by relying on improper evidence in reaching its conclusion that his conviction constitutes a particularly serious crime. He contends that the IJ and BIA erred by not considering facts relating to the crime of being a felon in possession, such as discussing the nature of his three prior felonies or his claim that he possessed firearms and ammunition for self-defense. He also contends that the IJ and BIA erred by considering facts which did not directly go to an element of the offense, such as the fact that he fired the weapon. According to Bare, the IJ and BIA should be limited to considering only what he did to be convicted of the offense.

The BIA may consider "all reliable information" in determining whether a crime constitutes a particularly serious crime, which is a wide-reaching inquiry and includes consideration of conviction records, sentencing information, and "other information outside the confines of a record of conviction." *N-A-M-*, 24 I. & N. Dec. at 342; *see also*

*Anaya-Ortiz*, 594 F.3d at 678. "[N]othing in the language of the 'particularly serious crime' provisions in the [Immigration and Nationality Act ("INA")] limits the scope of permissible evidence." *Anaya-Ortiz*, 594 F.3d at 678.

Here, all the information that the BIA considered was introduced in Bare's criminal case during sentencing so, as sentencing information, falls within the information specifically allowed to be considered. *See N-A-M-*, 24 I. & N. Dec. at 342. But, Bare contends that, since the information does not go toward the elements of the crime, it should not be considered. Most of the evidence considered by the IJ went to the manner in which Bare possessed the firearms and ammunition, namely how he came into possession of the firearms and ammunition (through the operation of an unlicensed pawnshop that trafficked in firearms, drugs, and alcohol), how he possessed the firearm (by firing it inside a house to threaten a neighbor during a verbal altercation, which presented a safety risk to other individuals inside the house), and his mental state relating to possessing the firearm (that he knew he could not possess a firearm, so he hid it inside a bag of dog food). This information is within the realm of what the IJ and BIA could consider. *See id.* at 337, 343 (considering, in evaluating whether a conviction for felony menacing in Colorado was a particularly serious crime, both the act that constituted the felony menacing—threatening to kill someone after retrieving two knives—but also the circumstance in which the felony menacing occurred—after he was caught performing a nonconsensual sexual act on a person who was asleep); *see also Denis*, 633 F.3d at 216 (finding that the BIA did not err in concluding that a conviction for tampering with evidence was a particularly serious crime by considering the tampering included "violently dismembering and concealing his victim").

The IJ also considered the effect that Bare's pawn business had on the community and other instances of Bare's making threats or being violent—information contained in the government's sentencing memorandum. Bare testified before the IJ and denied the threats or acts of violence, but here he does not challenge the reliability of the sentencing memorandum. Rather, Bare contends that it is improper evidence because it does not relate to his felon in possession conviction. *See Alaka v. Att'y Gen.*, 456 F.3d 88, 109 (3d Cir. 2006) ("Dismissed charges *ipso facto* are not convictions, and thus are not taken into account in . . . the . . . 'particularly serious crime' analysis."), *overruled on other grounds by Bastardo-Vale v. Att'y Gen.*, 934 F.3d 255 (3d Cir. 2019); *Yousefi v. INS*, 260 F.3d 318, 329–30 (4th Cir. 2001) (per curiam) ("We can find no authority for the proposition that dismissed counts or crimes not relied upon by the Service may be considered in determining whether a specific crime is a particularly serious one."). However, IJs may consider evidence about the alien which does not go to an element of the crime "as part of the separate determination of dangerousness." *Gomez-Sanchez v. Sessions*, 892 F.3d 985, 993–94 (9th Cir. 2018). We allow this even though a separate dangerousness determination is no longer considered independently as a factor in the particularly serious crime analysis. *Id.* at 991. "[D]angerousness remains the 'essential key' to determining whether the individual's conviction was for a particularly serious crime." *Id.* (quoting *Alphonsus*, 705 F.3d at 1041). In considering the seriousness of the crime, the IJ is "assessing whether the circumstances of the crime are so serious as to justify removal to a country where there is a significant risk of persecution." *Id.* at 994. Therefore, it was proper for the IJ to consider the circumstances in which Bare came into possession of the firearms he was convicted of possessing, the effect of that broader business on the

community, and other acts which go to his mental state. Noting again that our review "is limited to ensuring that the agency relied on the 'appropriate factors' and '[]proper evidence' to reach this conclusion," *Avendano-Hernandez*, 800 F.3d at 1077 (alteration in original), and that we "cannot reweigh evidence to determine if the crime was indeed particularly serious," *Blandino-Medina*, 712 F.3d at 1343, we cannot say that the evidence the BIA relied on to conclude that Bare's conviction is particularly serious was an abuse of its discretion.

Therefore, as the BIA did not abuse its discretion in concluding that Bare's conviction for being a felon in possession of a firearm constitutes a particularly serious crime, Bare is ineligible for withholding of removal.

**B.**

Bare contends that the IJ erred by refusing to consider his request for an adjustment of status. The IJ determined that, because Bare was in asylum-only proceedings, he did not have jurisdiction to consider a request for an adjustment of status; the BIA agreed with the IJ's conclusion. Bare argues that he lost his status as a stowaway when granted asylum and, therefore, reopening his asylum-only proceedings to terminate his grant of asylum was improper. Bare contends that as an asylee he should have instead been in INA § 240 removal proceedings, 8 U.S.C. § 1229a, in which an IJ can grant a request for an adjustment of status. In the alternative, Bare argues that, (1) even if he is still a stowaway, he should nonetheless have been in INA § 240 proceedings because of his status as an asylee and (2) even if asylum-only proceedings were proper, the IJ nonetheless had authority to adjudicate his request for an adjustment of status because of his status as an asylee. The government contends that Bare was properly in asylum-only proceedings

and that the IJ correctly determined that he did not have jurisdiction to consider Bare's request for an adjustment of status. In supplemental briefing, the government suggests that the USCIS, not the IJ, was the appropriate adjudicator of his request for an adjustment of status.

**1.**

We begin by addressing Bare's eligibility to apply for an adjustment of status. All asylees meeting the statutory requirements may apply for an adjustment of status. 8 U.S.C. § 1159(b). One of the requirements is that the asylee "is admissible." *Id.* § 1159(b)(5). Bare's firearm conviction makes him inadmissible, but the statute provides that the Secretary of Homeland Security ("DHS Secretary") or the Attorney General may waive all but five of the grounds for inadmissibility listed in 8 U.S.C. § 1182(a) "for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest." *Id.* § 1159(c). Bare's inadmissibility as a result of his conviction is waivable, so he could apply to have his status adjusted and for a waiver of the admissibility requirement.**[2]** *See id.*

Neither the government's motion to reopen Bare's asylum-only case, nor the IJ's granting the motion, terminated his asylum. *See* 8 C.F.R. § 1208.24(f). Bare remained an asylee until the IJ terminated his asylum. *See id*. As a result, Bare remained eligible to apply for an adjustment of status and a waiver, at the very least, until his asylum was terminated by the IJ. *See* 8 U.S.C. § 1159(b); *cf. Siwe v. Holder*, 742 F.3d 603, 612 (5th Cir. 2014) (holding

---

**[2]** As discussed *infra*, an alien's status as a stowaway is also waivable. *See* 8 U.S.C. §§ 1159(c), 1182(a)(6)(D).

that an alien whose asylum has been terminated may still apply for an adjustment of status).

## 2.

Since Bare was eligible to apply for an adjustment of status, and the IJ refused to consider his application because of an IJ's limited jurisdiction in asylum-only proceedings, we must determine what avenue Bare could have used to apply for an adjustment of status. That is, could he have applied to the IJ in asylum-only proceedings, or was he limited to applying to an IJ in INA § 240 proceedings or to the USCIS? To answer this question requires us to determine whether the government was required to terminate his asylum in INA § 240 proceedings or whether doing so by reopening his asylum-only proceeding was permissible. Before we can do that, we must first resolve the issue of Bare's status: did he lose his status as a stowaway when granted asylum?

Bare argues that he lost his status as a stowaway when he was granted asylum. The government argues that, when Bare lost his asylee status, "[t]hat returned him to the stowaway status he possessed prior to obtaining asylum," which suggests the government agrees with Bare's assertion that a grant of asylum terminates an alien's prior status. However, neither of these positions is consistent with the statutory text. Instead, the statute is clear that a grant of asylum is not a change in status—from a stowaway to an asylee—but confers on the stowaway an *additional status* as an asylee. *See* 8 U.S.C. §§ 1158(b)(1)(A), 1159.

"When interpreting a statute, we are guided by the fundamental canons of statutory construction and begin with the statutory text." *United States v. Neal*, 776 F.3d 645, 652 (9th Cir. 2015). The statute governing asylum, 8 U.S.C.

§ 1158, provides that an alien "may apply for asylum," *id.* at § 1158(a)(1), and that the DHS Secretary or Attorney General "may *grant* asylum to an alien who has applied," *id.* at § 1158(b)(1)(A) (emphasis added).  The operative word in the statute is "grant," which is not defined in the statute or by regulation.   The applicable dictionary definition of "grant" means to "give, bestow, [or] confer." *Grant*, *Merriam-Webster Unabridged Dictionary*, https://unabridged.merriam-webster.com/unabridged/grant.   In this context, the word "grant" conveys the receiving of a status.  It does not convey a termination of a prior status or a change from one status to another.  Thus, the express terms of the statute make clear that a grant of asylum to an alien provides a new status which does not terminate or change any status that the alien already held.

This understanding of the import of a grant of asylum in § 1158 is consistent with the surrounding statutory context. *See Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006) ("Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis.").  Most notable is § 1159, which addresses asylees adjusting their status to that of a lawful permanent resident.  It provides that the DHS Secretary or Attorney General "may *adjust to* the status of an alien lawfully admitted for permanent residence the status of any alien granted asylum" who meets certain requirements. 8 U.S.C. § 1159(b) (emphasis added).  When read together, Congress provides that an alien may be "grant[ed]" asylum and afterwards that alien may have his or her status "adjust[ed] to" that of a lawful permanent resident. *Id.* §§ 1158(b)(1)(A), 1159(b).  Both § 1158 and § 1159 were enacted as part of the Refugee Act of 1980, as sections § 208 and § 209, respectively.  *See* Pub. L. No. 96-212, §§ 208,

209, 94 Stat. 102, 105–06. "It is a well-established canon of statutory interpretation that the use of different words or terms within a statute demonstrates that Congress intended to convey a different meaning for those words." *SEC v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003). We "must presume that Congress intended a different meaning when it uses different words in connection with the same subject." *Ariz. Health Care Cost Containment Sys. v. McClellan*, 508 F.3d 1243, 1250 (9th Cir. 2007). Congress, then, must have intended something different by using "grant" to describe an alien becoming an asylee and "adjust to" to describe that same alien later becoming a lawful permanent resident.

To determine what Congress intended by using "grant" in § 1158, we must also examine the meaning of "adjust to" in § 1159. Although we have not considered the meaning of "adjust to" in § 1159 and whether an asylee loses his or her status as an asylee when adjusting to the status of a lawful permanent resident, the BIA and several other circuits have.[3]

In *In re N-A-I-*, 27 I. & N. Dec. 72 (B.I.A. 2017), the BIA considered whether aliens who had been granted asylum retain the status of an asylee when they adjust their status to that of a lawful permanent resident. There, the respondent had adjusted his status to that of a lawful permanent resident and he argued to the BIA that he could not be removed

---

[3] When we were previously faced with this question, we did not decide whether an adjustment of status terminates an alien's grant of asylum because the result was the same either way in that case. *See Robleto-Pastora v. Holder*, 591 F.3d 1051, 1059 (9th Cir. 2010) ("Without deciding and regardless of whether Robleto simultaneously holds asylee and [lawful permanent resident] status, we conclude that he is ineligible for relief from removal under . . . 8 U.S.C. § 1159, and that his petition must therefore be denied.").

because his asylum status had never been terminated—i.e., that his adjustment of status did not terminate his status as an asylee. *Id.* at 73. The BIA held that "an alien's adjustment from the status of an alien granted asylum to that of an alien lawfully admitted for permanent residence pursuant to [§ 1159(b)] terminates the alien's asylee status." *Id.* at 74. The BIA based this determination "on the statutory language, as well as the relevant regulatory provisions, case law, and legislative history." *Id.* at 75. Because "adjustment of status" is not defined by statute, the BIA looked to the dictionary definition of "adjust" which means "to bring to a more satisfactory state," or "to change the position of." *Id.* (quoting *Adams v. Holder*, 692 F.3d 91, 97 (2d Cir. 2012) (quoting *Webster's Third New International Dictionary* 27 (1986))). The BIA concluded that "[a]n adjustment of status . . . involves a change from one status to another status, not the acquisition of an additional status. In other words, an alien whose status is changed does not retain his or her previous status." *Id.* An adjustment of status "extinguishes the alien's asylee status." *Id.*

The BIA's decision in *N-A-I-* was appealed to the Fifth Circuit. *Ali v. Barr*, 951 F.3d 275 (5th Cir. 2020). In *Ali*, the Fifth Circuit affirmed the BIA's determination that an alien loses the status of an asylee when adjusting his or her status. The court emphasized that, not only is the use of "adjust" important, but so is the use of the word "to," which "indicates the alien's status is altered *in a more fundamental sense*—the alien goes from one status *to* another." *Id.* at 280. Citing several dictionary definitions, the court noted that "[t]he word 'to' also denotes the arrival at a new terminus." *Id.* The court concluded, "[o]n the plain text, then, the BIA was correct to conclude a new [lawful permanent resident] discards his old asylee status." *Id.*

The Fourth Circuit has also considered this issue and reached the same conclusion. *Mahmood v. Sessions*, 849 F.3d 187 (4th Cir. 2017). It concluded that an adjustment of status in § 1159(b) "describes a process of 'adjustment' from the former 'to' the latter. A provision that addresses two statuses and provides for the adjustment from one 'to' the other appears clearly to indicate a *change to* and *not an accretion of* the second status." *Id.* at 191. And the Second Circuit, in considering adjustments of status under a different statutory provision, similarly concluded that an adjustment of status is a change from one status to another. *Adams*, 692 F.3d at 97–98.

Thus, the surrounding statutory context confirms our interpretation of "grant." Congress's use of "adjust to" in § 1159 to convey a change from one status to another status supports our conclusion that Congress's use of "grant" in § 1158 was intended to convey something different: the addition of a status rather than a change from one status to another. *See McCarthy*, 322 F.3d at 656 ("Congress's explicit decision to use one word over another in drafting a statute is material.").

That a grant of asylum does not terminate an alien's status as a stowaway is also consistent with the larger statutory scheme. *See Choin v. Mukasey*, 537 F.3d 1116, 1120 (9th Cir. 2008) (considering the statutory scheme in interpreting the meaning of a term in the INA); *Bona v. Gonzales*, 425 F.3d 663, 670 (9th Cir. 2005) (same). Not all asylees are eligible to adjust their status. *See* 8 U.S.C. § 1159(b). Instead, only asylees meeting certain requirements are eligible to adjust their status. *See id.* (listing five eligibility requirements for an asylee to be able to adjust his or her status). One of the requirements is that the asylee "is admissible . . . at the time of examination for

adjustment." *Id.* § 1159(b)(5). The statute also includes a waiver provision which allows the DHS Secretary or Attorney General to waive most of the grounds for inadmissibility listed in § 1182(a) "for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest." *Id.* § 1159(c). The waiver provision lists several grounds for inadmissibility in § 1182(a) which do not constitute an inadmissibility for purposes of adjusting one's status. *Id.* § 1159(b), (c). And the waiver provision also includes several grounds for inadmissibility which cannot be waived. *Id.* § 1159(c). Thus, § 1159(b) and (c) create four categories of asylees with respect to adjustments of status: (1) admissible asylees who may adjust their status (provided they meet the other four criteria); (2) inadmissible asylees whose inadmissibility does not make them ineligible to adjust their status; (3) inadmissible asylees who can seek a waiver of the admissibility requirement to adjust their status; and (4) inadmissible asylees who cannot seek a waiver of the admissibility requirement and are statutorily barred from adjusting their status.

A stowaway is not admissible under § 1182(a). *See id.* § 1182(a)(6)(D) ("Any alien who is a stowaway is inadmissible."). Being a stowaway is not one of the grounds for inadmissibility listed in § 1159(c) that is excepted from the admissibility requirement and it is also not included in the list of grounds for inadmissibility that cannot be waived. *See id.* § 1159(c). Thus, a stowaway-asylee would fall into the category of inadmissible asylees who can seek a waiver of the admissibility requirement to adjust his or her status. The operation of § 1159 is thus consistent with a stowaway's retaining his or her status when granted asylum. If an alien lost the status as a stowaway when granted asylum, it would be expected that a stowaway's inadmissibility would be

included in § 1159(c)'s list of grounds of inadmissibility that do not require a waiver.

Not only is a stowaway retaining his or her status when granted asylum consistent with § 1159(c), the opposite is inconsistent with § 1159(c). Some grounds of inadmissibility that do not need a waiver and some that are non-waivable necessarily would have preceded the alien's being granted asylum. The former category includes "[a]ny alien *who seeks to enter the United States for the purpose* of performing skilled or unskilled labor" without certain certifications having been made by the Secretary of Labor. *Id.* § 1182(a)(5)(A)(i) (emphasis added).[4] The latter category includes "[a]ny alien who, during the period beginning on March 23, 1933, and ending on May 8, 1945, under the direction of, or in association with . . . the Nazi government of Germany" who "ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion."[5] 8 U.S.C. § 1182(a)(3)(E)(i). Similarly, individuals who participated in genocide, torture, or

---

[4] The other two categories of aliens listed in § 1182(a)(5) would also have had their respective grounds for inadmissibility prior to being granted asylum. *See* 8 U.S.C. § 1182(a)(5)(B) (providing that "[a]n alien . . . *who is coming to the United States* principally to perform services as a member of the medical profession is inadmissible" unless certain requirements are met (emphasis added)); *id.* § 1182(a)(5)(C) (providing that "any alien *who seeks to enter the United States* for the purpose of performing labor as a health-care worker, other than a physician, is inadmissible" unless certain requirements are met (emphasis added)).

[5] Any alien with this status would necessarily have had it prior to being granted asylum. This ground of inadmissibility was added in 1978, *see* Pub. L. No. 95-549, § 101, 92 Stat. 2065, 2065 (1978), and it was made a non-waivable inadmissibility for purposes of an asylee adjusting his or her status in 1980, Refugee Act of 1980 § 209, 94 Stat. at 106.

extrajudicial killing cannot have their inadmissibility waived.[6] *Id.* § 1182(a)(3)(E)(ii), (iii).[7] If an alien lost his or

---

[6] "Any alien who a consular officer or the Attorney General knows, or has reasonable ground to believe*, seeks to enter the United States* to engage solely, principally, or incidentally in" espionage, sabotage, violate export controls, any other unlawful activity, or overthrow the government, 8 U.S.C. § 1182(a)(3)(A) (emphasis added), is also prohibited from having these grounds for inadmissibility—which necessarily would have preceded a grant of asylum—waived, *see id.* § 1159(c).

[7] Although these aliens are not eligible for asylum in the first place, *see* 8 U.S.C. § 1158(b)(2)(A)(i), (iii) (providing that asylum may not be granted to an alien who "participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion" or if "there are serious reasons for believing that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States"), they have not always been ineligible for asylum. The original version of the asylum statute did not include any exceptions regarding who could be granted asylum. *See* Refugee Act of 1980 § 208, 94 Stat. at 105. An exception providing that aliens convicted of aggravated felonies could not apply for, or be granted, asylum was added in 1990. *See* Immigration Act of 1990, Pub. L. No. 101-649, § 515, 104 Stat. 4978, 5053. And the current exceptions, with subsequent minor changes, were added in 1996. *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C, § 604, 110 Stat. 3009, 3009-690 to -694. Meanwhile, the waiver provision for adjustments of status, enacted in the Refugee Act of 1980, § 209, has remained largely intact with only minor modifications. *See* Immigration Act of 1990 § 603, 104 Stat. at 5082 (modifying the waiver provision to correspond with formatting modifications to § 1182). Additional classes of inadmissible aliens have also been added to § 1159(c), thus adding to the class of non-waivable grounds. *See, e.g.*, Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, § 5501, 118 Stat. 3638, 3740 (adding torture and extrajudicial killing). Thus, at least at one point in time, some inadmissible aliens could receive a grant of asylum but that inadmissibility precluded the alien from later being able to adjust his or her status. *See* 8 U.S.C. §§ 1158, 1159(c), 1182(a)(14), (15), (25), (32), (33) (1982) (specifying several categories of aliens who could be granted

her status when granted asylum, there would be no need for these grounds for inadmissibility to be included as exceptions to the waiver requirement. *Cf. Neal*, 776 F.3d at 652 ("We must 'interpret [the] statut[e] as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous.'" (alteration in original) (quoting *Boise Cascade Corp. v. EPA*, 942 F.2d 1427, 1432 (9th Cir. 1991))). For the inclusion of these inadmissibility grounds not to be meaningless or superfluous, aliens granted asylum must retain their previous inadmissibility status when granted asylum. *See id.*; *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 681 (9th Cir. 2005) ("We try to avoid, where possible, an interpretation of a statute 'that renders any part of it superfluous and does not give effect to all of the words used by Congress.'" (quoting *Nevada v. Watkins*, 939 F.2d 710, 715 (9th Cir. 1991))).

Bare relies on two cases to argue that he lost his status as a stowaway when granted asylum—neither is persuasive. He first relies on a quote from *N-A-I-* which provides that "an alien whose status is changed does not retain his or her previous status." 27 I. & N. Dec. at 75. When put into context, this quote does not support Bare's argument, but actually undermines it. It states:

> An *adjustment of status* under the Act *involves a change* from one status to another status, not the acquisition of an additional status. In other words, an alien whose status is *changed* does not retain his or her previous

asylum despite being inadmissible—and whose inadmissibility necessarily existed prior to their grant of asylum—but who could not adjust their status).

> status. In the context of [§ 1159(b)], *the adjustment entails a change* from "the status of an[] alien granted asylum" to "the status of an alien lawfully admitted for permanent residence," which extinguishes the alien's asylee status.

*Id.* (second alteration in original) (emphasis added). In *N-A-I-*, the BIA concluded that an adjustment of status is a "change from one status to another" because of the dictionary definitions of "adjust," one of which was "to change the position of." *Id.* (citation omitted). But here, the operative phrase is not "adjust to" but "grant," whose definition does not convey a change from one status to another. So, not only does this quote from *N-A-I-* not support his argument, as discussed *supra*, *N-A-I-*'s conclusion regarding the import of an adjustment of status supports our conclusion that a grant of asylum is the "acquisition of an additional status" rather than "a change from one status to another status." *Id.*

Bare also relies on *Marincas v. Lewis*, 92 F.3d 195 (3d Cir. 1996), which concluded that "Congress clearly and unambiguously intended that the Attorney General establish a uniform asylum procedure that is to be applied irrespective of an alien's status as a stowaway." *Id.* at 201. Based on this, Bare contends that all aliens must be on equal footing after they are granted asylum with regard to applying for an adjustment of status. But *Marincas* does not support this contention. In *Marincas*, the Immigration and Naturalization Service ("INS"), the forerunner to the USCIS, had two different procedures for aliens seeking asylum: one for stowaways and one for all other aliens seeking asylum. *Id.* at 199–200. The INS's procedures for stowaways were less favorable to the applicant than the procedures provided

for other aliens applying for asylum. *Id.* "Section 1158(a), however, mandates that the asylum procedure established by the Attorney General be applied irrespective of an alien's status, which clearly would include aliens with stowaway status." *Id.* at 201. In other words, *Marincas* held that § 1158(a) required that the procedure for adjudicating asylum claims by stowaways be the same procedure as used for adjudicating asylum claims by other aliens who are eligible to apply for asylum. *Marincas* says nothing about how *asylees* are to be treated with regard to one another when applying for an *adjustment of status*.

Unlike § 1158(a), where the *Marincas* court found clear congressional intent in the use of the phrase "irrespective of such alien's status," § 1159 does not use that phrase, nor anything like it. Bare points to the text of § 1159(b) that refers to "any alien granted asylum," and claims that disadvantaging a stowaway once he or she has been granted asylum by virtue of his or her stowaway status would be inconsistent with "Congress's directive for adjustment of status to be available to '*any alien* granted asylum.'" But that is not what Congress provided. Congress did not provide that all asylees could adjust their status. Instead, Congress provided that asylees who meet five criteria are eligible to adjust their status, and provided that some asylees who do not meet the five criteria can obtain a waiver of the admissibility requirement. 8 U.S.C. § 1159(b). Congress also barred some asylees from being able to adjust their status. *Id.* at § 1159(c). Thus, contrary to Bare's assertion, Congress in § 1159 explicitly provided that not all asylees are eligible to adjust their status and, unlike § 1158, that there can be different procedures for how asylees apply for an adjustment of status (i.e., requiring some asylees to also apply for a waiver).

To conclude, as both Bare and the government would have us do, that an alien loses his or her previous status when granted asylum would be to ignore the plain meaning of the statute as well as Congress's explicit decision to use the word "grant" rather than "adjust to." The plain meaning of the statute and the statutory context make clear that a stowaway retains his or her status as a stowaway when granted asylum. As a result, Bare is not entitled to INA § 240 proceedings to have his grant of asylum terminated by no longer being a stowaway.

**3.**

Bare contends that his status as an asylee entitles him to INA § 240 removal proceedings even if he also retains his stowaway status. The government contends that it was permissible for Bare's asylum to be terminated by reopening his asylum-only proceeding and that, in such proceedings, the IJ does not have authority to consider an adjustment of status request.

No statute provides a procedure for how a grant of asylum is to be terminated. The asylum statute explains the circumstances under which the Attorney General may terminate asylum but does not provide a procedure for how the Attorney General is to do so. *See* 8 U.S.C. § 1158(c)(2). The statute includes a section titled "[r]emoval when asylum is terminated," which provides: "An alien [whose asylum may be terminated] is subject to any applicable grounds of inadmissibility or deportability under section[s] 1182(a) and 1227(a) of this title, and the alien's removal or return shall be directed by the Attorney General in accordance with sections 1229a [INA § 240] and 1231 of this title." *Id.* § 1158(c)(3). By its terms, this section does not explain *how* asylum is to be terminated, but only governs removal "*when* asylum is terminated." *Id.* (emphasis added); *see also*

*Robleto-Pastora v. Holder*, 591 F.3d 1051, 1058 n.5 (9th Cir. 2010) (stating that § 1158(c)(3) "simply provides that asylum may be terminated under specific circumstances and says nothing about formal termination proceedings").

The procedures for how to terminate asylum are provided by regulation. Where, as here, asylum was granted by an IJ, the IJ may reopen the case to terminate a grant of asylum. 8 C.F.R. §§ 208.24(f), 1208.24(f). The USCIS may make a motion to an IJ to have a case reopened. *See id.* § 1003.23(b)(1), (3). There is no time limit for how long after a case is closed that the government may seek to reopen it. *See id.* §§ 1003.23(b)(1), 1208.24(f).

The authority for asylum-only procedures for stowaways is 8 U.S.C. § 1225, which provides that "[a]n arriving alien who is a stowaway is not eligible to apply for admission or to be admitted" but a stowaway "may apply for asylum" if the stowaway is "found to have a credible fear of persecution." *Id.* § 1225(a)(2). However, "[i]n no case may a stowaway be considered an applicant for admission or eligible for a hearing under section 1229a [INA § 240]." *Id.* The procedures in asylum-only proceedings are the same procedures as in INA § 240 removal proceedings, but the scope of review is "limited to a determination of whether the alien is eligible for asylum or withholding or deferral of removal, and whether asylum shall be granted in the exercise of discretion." 8 C.F.R. § 1208.2(c)(3)(i). In addition, "all parties are prohibited from raising or considering any other issues, including but not limited to issues of admissibility, deportability, eligibility for waivers, and eligibility for any other form of relief." *Id.*

Bare argues that 8 C.F.R. § 1208.24(g) requires INA § 240 removal proceedings to terminate his grant of asylum. Section 1208.24(g) provides:

> Termination of asylum for arriving aliens. If the Service determines that an applicant for admission who had previously been granted asylum in the United States falls within conditions set forth in § 1208.24 and is inadmissible, the Service shall issue a notice of intent to terminate asylum and initiate removal proceedings under [INA § 240]. The alien shall present his or her response to the intent to terminate during proceedings before the immigration judge.

This section addresses what to do with "applicant[s] for admission who had previously been granted asylum" who are found to be inadmissible. *Id.* The phrase "applicant for admission" is used to refer to a subset of aliens. *See* 8 U.S.C. § 1225(a)(1) (stating that "[a]n alien present in the United States who has not been admitted or who arrives in the United States . . . shall be deemed for purposes of this chapter an applicant for admission"). Stowaways are specifically excluded from being applicants for admission. *Id.* § 1225(a)(2) ("In no case may a stowaway be considered an applicant for admission . . . ."); *see also* 8 C.F.R. §§ 235.1(f)(4) (providing that "[a]n alien stowaway is not an applicant for admission"), 1235.1(d)(4) (providing that "[a]n alien stowaway is not an applicant for admission"). Since, as 8 C.F.R. § 1208.24(g) indicates, an alien's status as "an applicant for admission" continues after the alien has been granted asylum, *see also In re V-X-*, 26 I. & N. Dec. 147, 150 (B.I.A. 2013) ("[A]lthough the [alien's] grant of asylum conferred a lawful status upon him, it did not entail an 'admission.'"), to include stowaways who have been granted asylum within § 1208.24(g) would contravene 8 U.S.C. § 1225(a)'s clear mandate that "[i]n no case may a stowaway be considered an applicant for admission." So, § 1208.24(g)

is not applicable to Bare because a stowaway-asylee is not "an applicant for admission who had previously been granted asylum" but a non-applicant for admission who has previously been granted asylum.

Because Bare retains his status as a stowaway, there is no statutory or regulatory bar to the government's moving to reopen, and the IJ's reopening, his asylum-only proceeding for the purpose of terminating his grant of asylum. Asylum may be terminated by reopening a case. 8 C.F.R. § 1208.24(f). Since Bare's asylum was granted in an asylum-only proceeding, the case to be reopened would be that same asylum-only proceeding. Bare provides no compelling reason why § 1208.24(f) should not apply here to allow the government to reopen the asylum-only proceedings to terminate his grant of asylum. Therefore, terminating Bare's asylum through reopening his asylum-only proceedings was not error.

Even though Bare is appropriately in asylum-only proceedings, he nonetheless contends that the prohibition on an IJ in such proceedings from considering his adjustment of status and waiver requests must give way to allow him to vindicate his eligibility to adjust his status. But not only would allowing the IJ to consider Bare's request for an adjustment of status contradict the limitations on asylum-only proceedings in 8 C.F.R. § 1208.2(c)(3)(i), it is also unnecessary because he has another avenue available to seek an adjustment of status.

An IJ in INA § 240 removal proceedings has the authority to adjudicate requests for an adjustment of status, *see* 8 C.F.R. § 1240.11(a)(1)–(2), and that authority is exclusive, *see* 8 C.F.R. §§ 209.2(c), 1209.2(c). On the other hand, an IJ in asylum-only proceedings is prohibited from considering requests for an adjustment of status. *See*

8 C.F.R. § 1208.2(c)(3)(i). Since asylum-only proceedings are not INA § 240 proceedings, the exclusivity provision for INA § 240 proceedings does not apply and the IJ is not the exclusive avenue for an alien to seek an adjustment of status. *See* 8 U.S.C. § 1225(a)(2) (stating that "[i]n no case may a stowaway be . . . eligible for a hearing under [INA § 240]"); 8 C.F.R. §§ 209.2(c) ("If an alien has been placed in removal, deportation, or exclusion proceedings, the application [for an adjustment of status] can be filed and considered only in proceedings under [INA § 240]."), 1209.2(c). As a result, an application for an adjustment of status is to be "filed in accordance with the form instructions." 8 C.F.R. § 209.2(c). The form is I-485 and it is filed with the USCIS. *Id.* § 1209.2(c). Thus, the USCIS retains the authority to consider Bare's request for an adjustment of status and for waiver even when he had an open asylum-only proceeding before an IJ. That is where Bare's request should have been directed.

We note that this process causes a potential conflict between the applicable regulation and the instructions to the I-485 form. An application to the USCIS for an adjustment of status is to be filed "in accordance with the form instructions," *id.* § 209.2(c), and the form instructions themselves are incorporated into the regulations, *id.* § 103.2(a). But the form instructs applicants with proceedings before an IJ to file their application with the IJ rather than the USCIS. *See* Form I-485, Instructions ("If you are in proceedings in Immigration Court . . . you should file this application with the appropriate Immigration Court."). Although the form instructions have the force of regulation, they are instructions to applicants applying for an adjustment of status. As such, they are intended to help an alien with the practical procedures for applying, not to be a lengthy, legalistic explanation accounting for every possible

circumstance. It is no surprise, then, that the form instructions do not address the situation here given that it appears to be exceedingly rare, if not unique. Further, although form instructions can override some contrary regulations in 8 C.F.R. Chapter I, *id.* § 103.2(a)(1), the exclusivity provision is found in both Chapters I and V, *see id.* §§ 209.2(c), 1209.2(c), and the limitations on an IJ's authority in asylum-only proceedings is found in Chapter V, *see id.* § 1208.2(c)(3)(i). Therefore, the form instructions should not be read so broadly as to create an inconsistency between them and the regulation—e.g., one stating apply to the USCIS and the other stating apply to the IJ—and, even if they were to, they cannot overcome the contrary regulations in Chapter V. Therefore, USCIS remains the way in which an asylee in reopened asylum-only proceedings is to apply for an adjustment of status despite any perceived form instructions to the contrary.

We also note that, by having a different decisionmaker for whether to grant a request for an adjustment of status and whether to terminate a grant of asylum, a grant of asylum may be terminated by an IJ prior to the USCIS's acting on an adjustment of status application. Here, for example, the IJ declined Bare's motion for a continuance to allow him to apply for an adjustment of status with the USCIS and terminated his grant of asylum. Unlike the Fifth Circuit, we have not considered whether a former asylee can apply for an adjustment of status, *see Siwe*, 742 F.3d at 612, much less that a former asylee who is a stowaway can apply for an adjustment of status. If a former asylee who is a stowaway could not adjust his or her status, there is a potential that an asylee could be denied the opportunity to adjust his or her status as a result of this bifurcation of authority, as the IJ might act faster in terminating a grant of asylum than the USCIS in considering whether to grant an adjustment of

status and a waiver. This is problematic because, as we previously determined, an asylee in reopened asylum-only proceedings can still apply for an adjustment of status (and any necessary waivers). The resolution of these issues goes beyond the case we have been presented. This is an issue for a later court to decide if Bare applies for an adjustment of status with the USCIS and the USCIS refuses to consider it. To resolve this case, it is enough to conclude that Bare met all of the requirements to apply for an adjustment of status, provided he also sought and received a waiver, and that his application was to be made to the USCIS, not the IJ.

**PETITION FOR REVIEW IS DENIED.**