**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

KWANG HYEN PARK,

*Petitioner,*

v.

MERRICK B. GARLAND, Attorney General,

*Respondent.*

No. 21-70623

Agency No.
A089-695-765

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted December 6, 2022
Pasadena, California

Filed June 29, 2023

Before: Ryan D. Nelson, Bridget S. Bade, and Danielle J. Forrest, Circuit Judges.

Opinion by Judge Forrest

# SUMMARY[*]

## Immigration

Denying Kwang Park's petition for review of a decision of the Board of Immigration Appeals, the panel held that the BIA applied the proper legal standard in denying withholding of removal and that the BIA properly denied relief under the Convention Against Torture (CAT).

Park pleaded guilty to 13 drug-related charges, including possession of cocaine for sale under California Health and Safety Code § 11351. In removal proceedings, the agency found Park removable for having committed a drug-trafficking aggravated felony and for having committed a controlled-substance offense. Applying the presumption established in *Matter of Y-L-,* 23 I. & N. Dec. 270 (A.G. 2002)—that drug-trafficking offenses are particularly serious crimes—the agency concluded that Park's § 11351 conviction was a particularly serious crime that barred withholding. The agency also denied CAT relief.

Addressing Park's contention that the agency applied the wrong standard to its particularly-serious-crime determination, the panel explained that, in *Matter of Y-L-,* the Attorney General instructed that aggravated felonies involving illicit drug trafficking are presumptively particularly serious crimes and that this presumption may be overcome only in the most extenuating circumstances that are both extraordinary and compelling. The panel noted that the BIA's particularly-serious-crime analysis here was

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

cursory, but concluded that the BIA applied *Matter of Y-L-*'s presumption and that the BIA's decision was supported by adequate reasoning. Observing that neither the IJ nor the BIA recited the *Matter of Y-L-* criteria, the panel explained that they are not required to do so. The panel also noted that the BIA considered facts not directly referenced in *Matter of Y-L-*'s minimum factors, but explained that those criteria were not exhaustive.

The panel further concluded that, even if it had found that the BIA erred by considering facts not expressly incorporated into *Matter of Y-L-*'s minimum standard, it would still deny Park's petition because it was a legal certainty that Park could not satisfy *Matter of Y-L-*'s minimum criteria. Thus, the panel concluded that this was one of those narrow circumstances where remand was unwarranted because the law dictates the outcome that the agency must reach.

As to CAT relief, Park alleged that the BIA committed multiple errors in denying such relief. First, Park argued that the BIA exceeded its regulatory authority by impermissibly engaging in predictive fact-finding. This argument was premised on the IJ's misstatement that Park had not shown that he would be tortured on account of a protected ground. The panel rejected that contention, explaining that the BIA did precisely what it is required to do: it concluded that the IJ's predictive factual findings were not clearly erroneous, and then considered whether those facts constituted torture and concluded that Park had not established it is more likely than not he will be subject to torture either for refusing to do or agreeing to perform military service, or due to his convictions in the United States.

The panel also concluded that the BIA corrected the IJ's misstatement of the legal standard for CAT relief, explaining that the BIA found that Park nonetheless failed to establish that it is more likely than not he will be tortured, regardless of the basis, upon his removal to South Korea. Thus, the panel concluded that the IJ's legal error did not undermine its factual findings and was cured when the BIA applied the correct legal standard to the facts found by the IJ.

The panel also rejected Park's contention that the BIA failed to provide a reasoned explanation for its decision, explaining that this argument was based on the mistaken view that the panel could review only the BIA's decision. The panel concluded that, when read alongside the IJ's multi-page CAT analysis, the BIA's decision adequately conveyed the reasoning behind the denial of CAT relief.

Turning to the merits of Park's CAT claim, the panel concluded that substantial evidence supported the agency's determination that Park is unlikely to be tortured because of his California drug convictions. The panel explained that, generally, prosecution and punishment for criminal activity do not constitute torture. Further, the panel concluded that South Korea's extraterritorial-jurisdiction law, allowing it to re-prosecute its citizens for crimes committed and punished outside of South Korea, is not inherently torturous. Nor was there any evidence that South Korea would apply its law more harshly to Park than to someone else similarly situated to him. Additionally, the panel concluded that the agency properly found that the possibility that South Korea may prosecute Park and impose harsh punishment for his California drug crimes is entirely speculative.

The panel also concluded that the agency's determination that Park will not be tortured under South

Korea's military-conscription policy was supported by substantial evidence. The panel noted that news articles Park submitted demonstrate that some members of the South Korean military have had tragic experiences, including mistreatment and suicide. However, the panel explained that military conscription and punishment for evasion of military duty seldom constitute torture. The panel further explained that the record did not establish that South Korea's decades-old conscription policy, which applies equally to all male citizens within the designated age range, is imposed with the intent of inflicting pain and suffering. The panel observed that the same was true of South Korea's alternative to military conscription—three years of labor—which is equally available to anyone who wishes to avoid military service.

The panel also concluded that Park did not meet his burden to show that he would face a particularized risk of mistreatment from military conscription as a cultural outsider, and rejected Park's claim that the agency failed to consider the aggregate impact of Park's claimed risks of torture.

## COUNSEL

Jean E. Reisz (argued) and Niels W. Frenzen, University of Southern California Gould School of Law, Los Angeles, California, for Petitioner.

Jeffrey M. Hartman (argued), Trial Attorney; M. Jocelyn Lopez Wright, Senior Litigation Counsel, Office of Immigration Litigation; Brian Boynton, Principal Deputy Assistant Attorney General, Civil Division; United States Department of Justice; Washington, D.C.; for Respondent.

**OPINION**

FORREST, Circuit Judge:

Petitioner Kwang Park, a lawful permanent resident and South Korean native and citizen, was arrested twice in three days for numerous drug-related crimes. He possessed a variety of illegal substances and other paraphernalia evidencing drug trafficking at both arrests, and he pleaded guilty to 13 charges, including possession of cocaine for sale. The Government sought to remove Park from the United States based on his convictions, and he applied for withholding of removal and protection under the Convention Against Torture (CAT), among other relief, claiming that he would be persecuted and tortured by the South Korean government if removed. Specifically, he claimed that South Korea would (1) re-prosecute and severely punish him for his drug crimes committed in this country and (2) force him to serve in the South Korean military consistent with its military-conscription policy. The Board of Immigration Appeals (BIA) denied Park relief and ordered him removed. In this appeal, Park argues that the BIA erred by improperly applying the presumption established in *Matter of Y-L-*, 23 I. & N. Dec. 270 (A.G. 2002)—that drug-trafficking offenses are particularly serious crimes, a finding that renders a petitioner ineligible for withholding of removal. He also argues that the BIA committed procedural and substantive errors in denying him relief under the CAT.

We deny Park's petition for review. The BIA properly applied *Matter of Y-L-* and did not abuse its discretion in concluding that the circumstances underlying Park's conviction establish that his is not "the very rare case" that justifies departing from the presumption that drug trafficking

is a particularly serious crime. *See* 23 I. & N. Dec. at 276. The BIA also properly denied CAT relief where it applied the proper standard, sufficiently explained its decision, and substantial evidence supports its conclusion that the harm that Park fears from the South Korean government does not constitute torture and instead arises from application of that country's generally applicable laws.

# I. BACKGROUND

## A. First Arrest

On April 3, 2018, Park was stopped by California Highway Patrol for speeding and improperly changing lanes. Officers discovered that Park was driving with a suspended license and without insurance. They also observed signs of intoxication and required Park to perform a "series of field sobriety tests," which he failed.

During a search of Park's car, officers found a loaded handgun and a canister of cocaine in a female passenger's purse. They also found over $2,600, including "a large amount of hundred dollar bills," in Park's wallet, two airsoft guns that resembled firearms, three small bags of cocaine, Xanax, numerous containers of cannabis, a scale covered "with white powdery residue," seven .40 caliber bullets, and a lock pick set. Park admitted that the handgun was his and that "the white powdery substance was cocaine."

The officers arrested Park, and he was charged with numerous drug or firearm-related offenses, including unlawful possession of a controlled substance with a firearm under California Health and Safety Code (CHSC) § 11370.1(a).

**B. Second Arrest**

Three days later, Park posted bail and retrieved his car from police impoundment in the morning. That night, Park was stopped again for speeding and for driving without a front license plate and with an improperly obstructed rear license plate. During the stop, Park admitted that there was a bag of cocaine under his seat. Officers again searched Park's car and found the bag under Park's seat, which contained 0.8 grams of cocaine, as well as four more small bags in the center console that each contained between 1.2 and 1.4 grams of cocaine. An officer also noticed that Park's car radio appeared to have been tampered with, and after removing the cover plate, the officer discovered a bag with 16.8 grams of cocaine, three bags containing a total of 137 Xanax pills, a bag with 95 Ecstasy pills, a bag with a single Ecstasy pill, and a scale covered in cocaine residue. During a later inventory of the car, officers also found a ledger showing "quantities of unknown substances" and "total value of these items," a bag containing a small amount of marijuana, a methamphetamine pipe, two beverage containers modified "to conceal illegal narcotics" covered in cocaine residue, numerous containers that were "consistent with the use to conceal/transport illegal narcotics," a box of latex gloves, and a bulletproof vest.

Park was again arrested and ultimately charged with, among other things, possession and transportation of cocaine for sale under CHSC §§ 11351, 11352(a). Park was questioned at the jail, and he admitted that the drugs and other contraband were his but asserted that they must have been in the car since his first arrest because he "would not be driving around with that much weight" and he "stopped carrying product" after his previous arrest. He also stated

that no one else had driven his car since he retrieved it from the impound lot, but some friends had ridden in it.

Park pleaded guilty to 13 charges arising from his two arrests. At sentencing, he received concurrent 674-day jail terms and five years' probation.

## C. Immigration Proceedings

After his convictions, Park was charged as removable for committing an aggravated felony (illicit trafficking of a controlled substance) and violating California controlled-substance laws. 8 U.S.C. § 1227(a)(2)(A)(iii), (B)(i). Park applied for cancellation of removal, asylum, withholding of removal, and CAT protection. In support of his applications, Park testified that neither he nor his family members were ever harmed in South Korea, but he fears returning to that country because his family lives in the United States and he no longer has any connections in South Korea. He also testified that he fears he will be harmed in South Korea because (1) he will be re-prosecuted for the drug crimes that he committed in the United States and will receive extremely harsh punishment, and (2) he will have to comply with South Korea's mandatory military service and will be mistreated by the military.

Regarding his criminal convictions, Park testified that he "heard from many sources" that he could be prosecuted and punished in South Korea for his crimes committed in the United States. He also submitted provisions of South Korean law relating to drug crimes and that country's extraterritorial jurisdiction, the latter of which allows prosecution and punishment for crimes that a South Korean citizen commits and is punished for in another country. Under South Korea's Narcotics Control Act, the government appears to have broad discretion to sentence those who "trade[]" narcotics

for profit or possess narcotics for such purpose, with possible punishment including life imprisonment and forced labor or the death penalty. Park also testified that he was told he would be unable to find a job in South Korea because of his criminal record. When asked how South Korea would learn about his California convictions, Park was "not sure."

Regarding South Korea's military conscription, Park testified that he has heard some people in the military "are not treated fairly and [are] abused," but when asked specifically what he thought would happen, he was "not sure." Males between 18 and 40 are required to serve in the South Korean military for two years.[1] Men with dual citizenship who were raised in the United States and identify as American have been conscripted into the military upon their return to South Korea. Park submitted news articles discussing the conditions of military service in South Korea, including that "cultural outsiders" who are conscripted into the military are isolated and abused and that the South Korean military is "notorious for harsh conditions, including hazing and rising suicide rates." Reported statistics from the South Korean Ministry of National Defense show an average of 82.2 suicide deaths each year between 2009 and 2013. In 2019, South Korea passed an alternative to military conscription—three years of forced labor—but Amnesty International has described it as "alternative punishment."

---

[1] The record evidence (news articles) regarding the age requirement may be incorrect and the actual requirement is 18–35. *See World Factbook, South Korea: Military and Security*, Cent. Intelligence Agency, https://www.cia.gov/the-world-factbook/countries/korea-south/#military-and-security [https://perma.cc/NZP3-M5A7] (last visited May 19, 2023). But this discrepancy is immaterial as Park is currently 29 years old.

The Immigration Judge (IJ) concluded that Park was statutorily ineligible for cancellation of removal and asylum due to his aggravated-felony and drug-trafficking convictions. Based on "the incident reports relating to [Park's] drug trafficking convictions," the IJ also found that Park was convicted of particularly serious crimes, making him ineligible for withholding of removal. The IJ detailed the circumstances of Park's two arrests, including the type and quantity of drugs that he possessed and that he had, among "other incriminating evidence," a firearm, large amounts of cash, a scale, body armor, and containers used to conceal drugs. The IJ found that "these factors contribute to persuade the Court that [Park] has been convicted of a particularly serious crime" and that Park did not show "pursuant to *Matter of Y-L-* that the specific facts in his case take the matter out of the presumption that his drug trafficking offenses are indeed particularly serious crimes."

The IJ also denied Park's application for CAT relief because Park had not suffered past torture and he failed to demonstrate that it was more likely than not that he would be tortured if removed to South Korea. The IJ explained: "As a general principle . . . prosecution for criminal activity is not something that rises to the level of persecution, let alone that rises to the level of torture . . . ." Although "disproportionately severe punishment or the existence of pretextual prosecution" could, in theory, rise to the level of torture, the IJ found that "the South Korean laws at issue would be applied equally to all South Korean citizens in a similar position and so [Park] would not be disproportionately punished compared to others who were similarly situated." "Moreover, [Park] was not able to establish anything other than speculation that he would indeed be prosecuted again in South Korea for the offenses

that he was already convicted of here in the United States." And despite the evidence that Park submitted, the IJ found that nothing indicates that the government "either habitually does, or intends to, prosecute someone who has already been convicted and punished for a crime in another country." The IJ also concluded that Park was not entitled to CAT protection because he had not shown "that any prosecution that he might suffer would be based upon a protected ground. Being a criminal or having a criminal record is not a particular social group that the Circuit has recognized." The IJ found that South Korea's military-conscription law, including the forced-labor alternative to military service, is neutrally applied. Thus, the IJ concluded that "the conduct [Park] fears from the South Korean government appears to be entirely proper administration of existing South Korean law."

The BIA dismissed Park's appeal. It concluded that Park was ineligible for withholding of removal because his conviction in his second case for possession of cocaine for sale under CHSC § 11351 was a particularly serious crime. The BIA did not consider whether any of Park's other convictions were particularly serious crimes. The BIA also concluded that the IJ "appropriately applied the presumption that drug trafficking offenses are particularly serious crimes," and, citing *Matter of Y-L-*, that Park failed to "overcome this presumption given that he had multiple arrests for possession of controlled substances, multiple types of controlled substances in his possession at both arrests, and a loaded firearm in his possession."

Regarding CAT relief, the BIA concluded that the IJ's predictive factual findings were not clearly erroneous. Recognizing that the IJ did err in stating that Park needed to establish "any punishment or prosecution he might suffer

would be based on a protected ground," the BIA clarified that "[a]n applicant for protection under the CAT need not show feared torture on account of a protected ground." Nonetheless, the BIA concluded that Park had not established that he was likely to suffer torture "for refusing to do or agreeing to perform military service, or due to his convictions in the United States."

In this appeal, Park challenges the BIA's denial of withholding of removal and CAT relief. He argues that the BIA erred in determining that his drug-trafficking conviction was a particularly serious crime by confusing the facts of his two arrests and misapplying the presumption established in *Matter of Y-L-*. Park also argues that he was erroneously denied CAT protection because the record compels the conclusion that he will be tortured if removed to South Korea. Alternatively, he argues that the BIA committed several errors that warrant remand.

## II. DISCUSSION

### A. Criminal-Alien Jurisdiction Bar

The first issue we consider is whether we have jurisdiction over Park's petition for review. *See Gonzalez-Caraveo v. Sessions*, 882 F.3d 885, 891 (9th Cir. 2018) ("We have jurisdiction to determine our own jurisdiction." (alteration and citation omitted)). The criminal-alien jurisdiction bar deprives us of jurisdiction over final orders of removal issued against aliens who are removable for having committed a criminal offense listed in 8 U.S.C. § 1227(a)(2)(A)(iii), (B)–(D). 8 U.S.C. § 1252(a)(2)(C). There are several exceptions to this jurisdictional bar. *See Flores v. Barr*, 930 F.3d 1082, 1086–87 (9th Cir. 2019) (per curiam). Under the Limited Review Provision, 8 U.S.C. § 1252(a)(2)(D), we retain jurisdiction to consider legal or

constitutional claims, including whether a particular conviction falls within the categories defined in Section 1227.[2] *Flores*, 930 F.3d at 1086. If the agency does not rely on the alien's conviction in denying relief, the jurisdictional bar also does not apply. *Id.* And the Supreme Court has clarified that the criminal-alien jurisdiction bar does not preclude judicial review of factual challenges to the agency's denial of CAT relief. *Nasrallah v. Barr*, 140 S. Ct. 1683, 1690 (2020).

The criminal-alien jurisdiction bar is triggered by Park's convictions. The agency ordered Park removed under Section 1227(a)(2)(A)(iii) (aggravated felony) and Section 1227(a)(2)(B)(i) (controlled-substance offense). Although the agency denied Park withholding of removal based on his criminal convictions, Park raises a colorable legal claim that the BIA applied the wrong legal standard in determining that he was ineligible for withholding of removal under 8 U.S.C. § 1231(b)(3)(B)(ii) because he had been convicted of a particularly serious crime. Thus, we have jurisdiction to review this legal challenge under the Limited Review Provision. *See* 8 U.S.C. § 1252(a)(2)(D); *Mairena v. Barr*, 917 F.3d 1119, 1123 (9th Cir. 2019) (per curiam). And as stated, there is no barrier to our reviewing Park's challenge to the denial of his application for CAT relief. *Nasrallah*, 140 S. Ct. at 1694.

## B. Scope of Review

There is also the threshold issue of which agency decision we should review. Park argues that we can review

---

[2] Questions of law include mixed questions—the "application of a legal standard to undisputed or established facts." *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1068 (2020).

only the BIA's decision. When the BIA reviews the IJ's decision de novo, "our review is limited to the BIA's decision except to the extent that the IJ's opinion is expressly adopted." *Garcia v. Wilkinson*, 988 F.3d 1136, 1142 (9th Cir. 2021) (internal quotation marks and citation omitted). But when the BIA appears to have conducted de novo review, yet the decision lacks any significant analysis, it "suggests that the BIA gave significant weight to the IJ's findings" and we may "look to the IJ's . . . decision as a guide to what lay behind the BIA's conclusion." *Avetova-Elisseva v. INS*, 213 F.3d 1192, 1197 (9th Cir. 2000); *see also Garcia-Martinez v. Sessions*, 886 F.3d 1291, 1293 (9th Cir. 2018) (noting that when "the BIA agrees with the IJ's reasoning, we review both decisions").

Here, the BIA's particularly-serious-crime analysis under *Matter of Y-L-* and its discussion of Park's CAT claim were brief. The BIA noted that the IJ "appropriately applied the presumption that drug trafficking offenses are particularly serious crimes" and stated that it agreed with the IJ that Park had not overcome that presumption, citing the relevant case law and portions of the IJ's decision. The BIA then added less than a sentence detailing its reasoning for why Park could not rebut the *Matter of Y-L-* presumption: "[Park] had multiple arrests for possession of controlled substances, multiple types of controlled substances in his possession at both arrests, and a loaded firearm in his possession." The BIA's discussion of Park's CAT claim, which also cited relevant portions of the IJ's decision, was even more cursory. We thus conclude that "the BIA gave significant weight to the IJ's findings," and we review both the BIA's and the IJ's decisions, "look[ing] to the IJ's . . . decision as a guide to what lay behind the BIA's conclusion." *Avetova-Elisseva*, 213 F.3d at 1197; *see also*

*Ornelas-Chavez v. Gonzales*, 458 F.3d 1052, 1058 (9th Cir. 2006) (reviewing both decisions where the BIA merely stated it agreed with the IJ's denial of relief).

## C.    Particularly Serious Crime

In reviewing whether the BIA applied the correct legal standard in its particularly-serious-crime analysis, we consider "whether the agency relied on the appropriate factors and proper evidence to reach [its] conclusion." *Flores-Vega v. Barr*, 932 F.3d 878, 884 (9th Cir. 2019) (alteration in original) (internal quotation marks and citation omitted). We disturb the agency's judgment only if it "acted arbitrarily, irrationally, or contrary to law" by failing to apply or misapplying the proper standard. *Bare v. Barr*, 975 F.3d 952, 961 (9th Cir. 2020). "[W]e may not reweigh the evidence and reach our own determination about the crime's seriousness." *Hernandez v. Garland*, 52 F.4th 757, 765 (9th Cir. 2022) (internal quotation marks and citation omitted).

Even if a petitioner otherwise satisfies the standard for withholding of removal, he is categorically ineligible for this relief if he has been convicted of a "particularly serious crime." 8 U.S.C. § 1231(b)(3)(B)(ii). There are two standards for determining whether an offense is a particularly serious crime. First, an aggravated felony with an aggregate sentence of at least five years' imprisonment is categorically a particularly serious crime. *Id.* § 1231(b)(3)(B)(iv). Second, the Attorney General may designate other offenses as particularly serious crimes on a case-by-case basis. *Bare*, 975 F.3d at 961. Because Park received less than five years' imprisonment for his convictions, our inquiry falls under the second standard.

Generally, the agency's case-by-case determinations are governed by the analysis established in *In re Frentescu*, 18

I. & N. Dec. 244, 247 (B.I.A. 1982), as refined by subsequent decisions. *Bare*, 975 F.3d at 961. Under this analysis, a court considers: "(1) the nature of the conviction, (2) the type of sentence imposed, and (3) the circumstances and underlying facts of the conviction." *Id.* (internal quotation marks omitted and citation omitted). But the Attorney General has instructed that aggravated felonies involving illicit drug trafficking are presumptively particularly serious crimes and that this presumption may be overcome only in "the most extenuating circumstances that are both extraordinary and compelling." *Matter of Y-L-*, 23 I. & N. Dec. at 274. We afforded *Chevron* deference to *Matter of Y-L-*, concluding that "the Attorney General's construction of § 1231(b)(3)(B) as providing him with discretion to create a strong presumption that drug trafficking offenses are particularly serious crimes is not impermissible." *Miguel-Miguel v. Gonzales*, 500 F.3d 941, 949 (9th Cir. 2007). Consequently, "a *Frentescu* analysis is no longer required with regard to drug trafficking offenses." *Id.*; *see also Gilbertson v. Garland*, 7 F.4th 700, 705 n.1 (8th Cir. 2021) (explaining the *Frentescu* framework does not apply where *Matter of Y-L-* applies).

Determining whether an offense is a particularly serious crime is "inherently discretionary." *Pechenkov v. Holder*, 705 F.3d 444, 448 (9th Cir. 2012). Whether a drug-trafficking offense overcomes the "extraordinarily strong presumption" of particular seriousness under *Matter of Y-L-* is equally discretionary, if not more so. *See Miguel-Miguel*, 500 F.3d at 947; *id.* at 946 (noting the presumption is "rebutted only in the 'extraordinary,' 'extenuating' and 'compelling' case" (quoting *Matter of Y-L-*, 23 I. & N. Dec. at 274)). The Attorney General did not "define the precise boundaries of what . . . unusual circumstances" would

overcome this presumption, but he did specify that "at a *minimum*" an alien would have to show that his drug-trafficking conviction involved:

> (1) a very small quantity of controlled substance;
>
> (2) a very modest amount of money paid for the drugs in the offending transaction;
>
> (3) merely peripheral involvement by the alien in the criminal activity, transaction, or conspiracy;
>
> (4) the absence of any violence or threat of violence, implicit or otherwise, associated with the offense;
>
> (5) the absence of any organized crime or terrorist organization involvement, direct or indirect, in relation to the offending activity; and
>
> (6) the absence of any adverse or harmful effect of the activity or transaction on juveniles.

*Matter of Y-L-*, 23 I. & N. Dec. at 276–77. "Only if *all* of these criteria were demonstrated by an alien would it be appropriate to consider whether other, more unusual circumstances (*e.g.*, the prospective distribution was solely for social purposes, rather than for profit) *might justify departure from*" the presumption that drug trafficking offenses are particularly serious crimes. *Id.* at 277 (second emphasis added). Thus, if an alien fails to satisfy even one of the *Matter of Y-L-* criteria, he cannot overcome the presumption that his drug-trafficking crime is particularly

serious, and the inquiry may cease. *See Miguel-Miguel*, 500 F.3d at 946–47; *Tunis v. Gonzales*, 447 F.3d 547, 549–50 (7th Cir. 2006).

But as previously noted, the minimum criteria specified in *Matter of Y-L-* are not exhaustive, and the Attorney General did not prohibit the agency from considering other criteria indicating that a particular drug-trafficking offense is not "the very rare case" where the presumption of particular seriousness should not apply. 23 I. & N. Dec. at 276. To the contrary, the Attorney General instructed that "if *all* of these criteria were demonstrated," it "would be appropriate" for the agency "to consider whether other, more unusual circumstances" might justify departing from the presumption. *Id.* at 277. That is, the agency may not consider non-listed factors that *favor* rebutting the presumption before it determines that the alien has satisfied the listed minimum criteria, *id.*, but the same is not true if the agency identifies unlisted factors or circumstances that demonstrate the crime of conviction was serious and the presumption should apply. The agency's ultimate task, after all, is to apply the presumption absent "the most extenuating circumstances that are both extraordinary and compelling." *Id.* at 274. The agency does not abuse its discretion by concluding that this extraordinary-and-compelling standard is not met based on circumstances evidencing that the offense is particularly serious, even if those circumstances were not expressly listed by the Attorney General in defining the *minimum* showing that an alien must make to overcome the presumption.

In this case, Park does not dispute that his conviction at issue—possession of cocaine for sale in violation of CHSC § 11351 from his second arrest—is an aggravated drug-trafficking felony and that *Matter of Y-L-* governs. 23 I. &

N. Dec. at 274; *see Lopez v. Sessions*, 901 F.3d 1071, 1074–75 (9th Cir. 2018) (holding that CHSC § 11351 defines an aggravated felony for purposes of removal under 8 U.S.C. § 1227(a)(2)(A)(iii)). Instead, Park contends that the BIA committed two legal errors in determining that he failed to rebut the *Matter of Y-L-* presumption. First, he argues that the BIA improperly relied on his possession of a firearm in his first arrest, which was separate from his drug-trafficking conviction resulting from his second arrest. Second, he argues that the BIA failed to apply the *Matter of Y-L-* factors and erroneously substituted its own factors.

There is no doubt that the BIA's particularly-serious-crime analysis was cursory and referenced facts not explicitly listed in *Matter of Y-L-*'s minimum-standard factors. Nonetheless, the BIA applied *Matter of Y-L-*'s presumption and its decision was supported by adequate reasoning. The BIA cited both *Matter of Y-L-* and our precedent granting *Chevron* deference to that decision. And it concluded that the IJ "appropriately applied the presumption that drug trafficking offenses are particularly serious crimes," an unmistakable reference to *Matter of Y-L-*'s standard. Thus, although the agency's citation of the correct standard is not determinative, *see Gomez-Sanchez v. Sessions*, 892 F.3d 985, 995 (9th Cir. 2018), we are confident that the BIA applied the *Matter of Y-L-* presumption when it decided this case, *see Martinez v. Clark*, 36 F.4th 1219, 1230–31 (9th Cir. 2022) (explaining that absent indication of a problem, "we accept that the BIA applied the correct legal standard if the BIA expressly cited and applied [the relevant caselaw] in rendering its decision" (alteration in original) (internal quotation marks and citation omitted)).

The question posed by Park's petition is really whether the agency *mis*applied *Matter of Y-L-*. Park is correct that

neither the IJ nor the BIA recited the *Matter of Y-L-* criteria that a petitioner must satisfy to rebut the presumption of particular seriousness. But they are not required to do so. *Sanabria Morales v. Barr*, 967 F.3d 15, 22 & n.1 (1st Cir. 2020); *cf. Bare*, 975 F.3d at 962–63 (holding the agency did not need to "explicitly" list or discuss the elements required to prove possession of a firearm by a felon when the agency "noted facts which correspond to all the elements of the offense as weighing in favor of the crime being particularly serious"). It is also true that the BIA considered facts not directly referenced in *Matter of Y-L-*'s minimum factors. Specifically, the BIA concluded that Park's crime was particularly serious because "he had multiple arrests for possession of controlled substances, multiple types of controlled substances in his possession at both arrests, and a loaded firearm in his possession."

Under the *Chenery* doctrine, "reviewing courts . . . generally must assess the lawfulness of an agency's action in light of the explanations the agency offered for it rather than any *ex post* rationales a court can devise." *Garland v. Ming Dai*, 141 S. Ct. 1669, 1679 (2021) (citing *SEC v. Chenery Corp.*, 318 U.S. 80 (1943)); *see also Gutierrez-Zavala v. Garland*, 32 F.4th 806, 810 (9th Cir. 2022). But we also "must 'uphold' even 'a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Ming Dai*, 141 S. Ct. at 1679 (citation omitted). We do not require that the agency "engage in a lengthy discussion of every contention raised by a petitioner. Instead, all that is required is that it consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Hernandez*, 52 F.4th at 768 (internal quotation marks and citations omitted).

The agency's path of reasoning here is discernable. The IJ invoked the *Matter of Y-L-* presumption and thoroughly recited the facts from Park's arrests. The BIA affirmed the IJ's reasoning and added its own discussion of the presumption. As we have explained, the ultimate question for the agency under *Matter of Y-L-* is whether the circumstances of the drug-trafficking conviction establish that it is the "extraordinary and compelling" case warranting departure from the presumption that such conduct is particularly serious. 23 I. & N. Dec. at 274. This case demonstrates that there can be circumstances not listed by the Attorney General that establish a particular conviction is not such an extraordinary case. The agency did not abuse its discretion by considering improper factors or evidence when it determined that Park had been arrested twice in three days for drug-related offenses and possessed a variety of drugs both times. *See Flores-Vega*, 932 F.3d at 884. Repeated conduct of the same or similar character is no doubt relevant in assessing the seriousness and risk of danger posed to the community by the petitioner's conduct. It is also relevant to assessing whether the petitioner was "merely peripheral[ly] involve[d]" in the criminal activity, which is one of *Matter of Y-L-*'s factors. 23 I. & N. Dec. at 276; *see id.* at 277–78 (finding that the petitioners were "direct actor[s] or perpetrator[s] . . . in their respective criminal activities").

Likewise, that Park possessed multiple types of drugs is relevant to assessing the seriousness of his trafficking conviction. This fact can inform the extent of a petitioner's involvement in drug trafficking. It may also inform the quantity of drugs that a petitioner possessed, which is also one of *Matter of Y-L-*'s factors. *Id.* at 276. Based on the specific facts here, the BIA's reference to the variety of drugs that Park possessed at his second arrest inherently

implicates the *quantity* of drugs that he possessed. At his second arrest, police found that Park possessed five small bags of cocaine ranging in weight from .8 grams to 1.4 grams, a bag of cocaine weighing 16.8 grams, over 137 Xanax pills and 95 Ecstasy pills, and small amounts of other pills and marijuana. The IJ recounted the fruits of this search in his decision, which the BIA relied on and implicitly adopted. On this record, any logical gap between the multiple *types* of drugs that Park possessed and the *quantity* of drugs that he possessed is immaterial. *See id.* at 277 (finding that the petitioners "failed to demonstrate that the volume or value of controlled substances involved in their offenses was *de minimis* or inconsequential"). The agency's reference to the various substances that Park possessed demonstrates that it recognized Park was not convicted for having only "a very small" or "inconsequential" amount. *Id.* at 276–77; *cf. United States v. Lopez*, 477 F.3d 1110, 1114 & n.16 (9th Cir. 2007) ("[A] typical dose of cocaine can be *as little as one-fourth of a gram* . . . ." (emphasis added) (citation omitted)). In sum, while the BIA's analysis was limited, we conclude that the factors it considered were consistent with *Matter of Y-L-* and that its decision was "comfortably on the right side of the line separating the 'tolerably terse' from the 'intolerably mute.'" *Hernandez*, 52 F.4th at 768 (citation omitted).

Even if we were to conclude that the BIA erred by considering facts not expressly incorporated into *Matter of Y-L-*'s minimum standard, we would still deny Park's petition. We have recognized that remand is an "idle and useless formality" when the BIA applies the wrong legal standard if, as a result of its factual findings, "neither the result nor the BIA's basic reasoning would change." *Singh v. Barr*, 935 F.3d 822, 827 (9th Cir. 2019) (per curiam)

(citation omitted); *see also Halim v. Holder*, 590 F.3d 971, 980 (9th Cir. 2009) (Cudahy, J., concurring) (explaining remand was futile because agency's adverse-credibility determination left "no basis for evidentiary analysis" and necessarily defeated petitioner's claim despite intervening caselaw changing the applicable legal standards). That is the case here. Based on the agency's assessment of the facts underlying Park's conviction, which he does not challenge, it is a legal certainty that Park cannot satisfy *Matter of Y-L-*'s minimum criteria required to overcome the presumption that his drug-trafficking conviction is a particularly serious crime. Thus, this is one of those "narrow circumstances" where remand is unwarranted because the law dictates the outcome that the agency must reach. *See Calcutt v. FDIC*, 143 S. Ct. 1317, 1321 (2023) (per curiam).

### D. CAT Relief

Park also alleges that the BIA committed multiple errors in denying him CAT relief. He argues that (1) the BIA exceeded its regulatory authority by impermissibly engaging in predictive fact-finding, (2) the BIA failed to give a reasoned explanation for its decision, (3) the evidence compels the conclusion that he is more likely than not to be tortured by the South Korean government, and (4) the BIA erred by not aggregating his potential sources of torture. We reject each of Park's arguments and conclude that the BIA did not err in denying CAT relief.

### 1. Procedural Arguments

We review questions of law regarding CAT claims de novo. *Velasquez-Samayoa v. Garland*, 49 F.4th 1149, 1154 (9th Cir. 2022). Park's argument that the BIA made impermissible factual findings is premised on the IJ's misstatement that Park had not shown that he would be

tortured on account of a protected ground. Park argues this legal error necessarily means the IJ's factual findings were also legally infirm, and that the BIA's adoption of the IJ's factual findings without first remanding for the IJ to apply the proper legal standard constituted impermissible fact-finding. We disagree.

The BIA reviews an IJ's CAT determination under a mixed standard of review: first, the BIA reviews for clear error the IJ's predictive factual findings as to whether a petitioner will be tortured in the country of removal, and second, the BIA exercises de novo review to determine whether those facts meet the legal requirements for CAT relief. *See* 8 C.F.R. § 1003.1(d)(3)(i)–(ii); *Perez-Palafox v. Holder*, 744 F.3d 1138, 1145 (9th Cir. 2014). Here, the BIA concluded that the IJ's predictive factual findings were not clearly erroneous. It then considered whether those facts constituted torture and concluded that "[Park] ha[d] not established it is more likely than not he would be subject to torture either for refusing to do or agreeing to perform military service, or due to his convictions in the United States." This is precisely what the BIA is required to do. *See Perez-Palafox*, 744 F.3d at 1145–46. And Park "does not point to any fact found by the IJ that was ignored by the BIA, or any fact found by the BIA that was not found by the IJ." *Id.* at 1145.

Moreover, "[w]here the BIA conducts a de novo review, [a]ny error committed by the IJ will be rendered harmless by the [BIA]'s application of the correct legal standard." *Brezilien v. Holder*, 569 F.3d 403, 411 (9th Cir. 2009) (second alteration in original) (citation omitted). The BIA corrected the IJ's misstatement of the legal standard for CAT relief and concluded that Park nonetheless failed to establish that "it is more likely than not he will be tortured, *regardless*

*of the basis*, upon his removal to South Korea." *See Cole v. Holder*, 659 F.3d 762, 770 (9th Cir. 2011) ("[A]n applica[nt] for CAT relief need not show that he will be tortured 'on account of' any particular ground."). Thus, the IJ's legal error did not undermine its factual findings and was cured when the BIA applied the correct legal standard to the facts found by the IJ. *See Avendano-Hernandez v. Lynch*, 800 F.3d 1072, 1078 (9th Cir. 2015); *Singh v. Holder*, 591 F.3d 1190, 1198 (9th Cir. 2010).

Park is also incorrect that the BIA failed to provide a reasoned explanation for its decision. This argument is premised on his mistaken view that we can review only the BIA's decision. We start with the presumption that the BIA reviewed the record and considered all relevant evidence. *See Hernandez*, 52 F.4th at 770–71; *Szonyi v. Barr*, 942 F.3d 874, 897 (9th Cir. 2019). And as discussed, we can look to the IJ's decision "as a guide to what lay behind the BIA's [decision].'" *Avetova-Elisseva*, 213 F.3d at 1197; *see also Rodriguez-Jimenez v. Garland*, 20 F.4th 434, 438 (9th Cir. 2021), *overruled on other grounds by Alam v. Garland*, 11 F.4th 1133, 1135–36 (9th Cir. 2021) (en banc). Only where there is some indication that the BIA overlooked relevant evidence, including by "misstating the record or failing to mention highly probative or potentially dispositive evidence," do we question whether it properly considered the record. *Hernandez*, 52 F.4th at 771–72 (alteration adopted) (citation omitted).

Here, the IJ thoroughly addressed both of Park's future-torture theories, his testimony, and the documentary and country-conditions evidence. The IJ specifically explained why the harm that Park fears is speculative and non-particularized and would not constitute torture. The BIA cited these portions of the IJ's decision multiple times in its

CAT discussion. It is also clear that the BIA considered Park's two theories because it concluded that he failed to show "it is more likely than not he would be subject to torture either for refusing to do or agreeing to perform military service, or due to his convictions in the United States." When read alongside the IJ's multi-page CAT analysis, the BIA's decision "adequately convey[s] the reasoning behind the denial of [Park's] CAT claim." *Rodriguez-Jimenez*, 20 F.4th at 439 (citation omitted).[3]

## 2. Merits

We review factual findings underlying the BIA's denial of relief for substantial evidence. *Plancarte Sauceda v. Garland*, 23 F.4th 824, 831 (9th Cir. 2022). The agency's factual findings "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). To be eligible for CAT relief, a petitioner must show that it is more likely than not

---

[3] The cases Park relies on are inapposite. In *Pirir-Boc v. Holder*, 750 F.3d 1077, 1085–86 (9th Cir. 2014), we held that the BIA failed to provide a "reasoned explanation" for its decision when it stated only that "[petitioner] has failed to establish a *prima facie* case for eligibility for relief under the [CAT]." *Id.* at 1085. The IJ in *Pirir-Boc* denied the petitioner's CAT claim solely because he failed to specifically request that relief. *Id.* at 1085 n.9. But here, the IJ addressed the merits of Park's CAT claim. Additionally, the BIA here did not provide such a conclusory decision because it linked the CAT standard to Park's two theories of torture. And the IJ's decision provides adequate reasoning to support the BIA's decision. *Cole v. Holder*, 659 F.3d at 772, a case in which the agency failed to consider "potentially dispositive evidence," is likewise inapt because Park has not demonstrated that the BIA or IJ failed to consider any similarly dispositive evidence. *See id.* at 771–75 (remanding where the BIA mischaracterized an expert's testimony and entirely failed to acknowledge a second expert and corroborating documentary evidence that supported the petitioner's CAT claim).

that he would be tortured by or with the consent or acquiescence of a public official in the country of removal. *Diaz-Reynoso v. Barr*, 968 F.3d 1070, 1089 (9th Cir. 2020). "Torture is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment . . . ." 8 C.F.R. § 1208.18(a) (defining torture as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person").

In determining whether an applicant is likely to be tortured, the agency must consider all relevant evidence, including (i) evidence of past torture, (ii) evidence that the applicant could relocate within the country of removal, (iii) "[e]vidence of gross, flagrant or mass violations of human rights within the country of removal," and (iv) other relevant information regarding conditions in the country of removal. *Id.* § 1208.16(c)(3). Generalized evidence of violence and crime is insufficient to establish a likelihood of torture. *Delgado-Ortiz v. Holder*, 600 F.3d 1148, 1152 (9th Cir. 2010) (per curiam). The record must show that it is more likely than not that the petitioner will face a *particularized* and *non-speculative* risk of torture. *See Tzompantzi-Salazar v. Garland*, 32 F.4th 696, 706–07 (9th Cir. 2022). The agency must also consider the *aggregate risk* of torture that an applicant would face from all possible sources. *Velasquez-Samayoa*, 49 F.4th at 1154.

Recognizing that "[t]orture does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions," 8 C.F.R. § 1208.18(a)(3), Park nonetheless argues that South Korea's "lawful" yet "draconian" punishments for drug crimes and its military-conscription policy rise to the level of torture. Again, we disagree.

### i. Drug Convictions

Substantial evidence supports the agency's determination that Park is unlikely to be tortured because of his California drug convictions. Generally, prosecution and punishment for criminal activity do not constitute torture. *See Bromfield v. Mukasey*, 543 F.3d 1071, 1077 (9th Cir. 2008) (noting that "legitimate criminal prosecution generally does not constitute persecution"); *Cruz-Samayoa v. Holder*, 607 F.3d 1145, 1151 (6th Cir. 2010) ("[T]here is a marked distinction between persecution and criminal prosecution."); *Abdel-Rahman v. Gonzales*, 493 F.3d 444, 452 (4th Cir. 2007) (noting that the principle that potential criminal prosecution generally does not constitute persecution "respects a government's freedom to devise its own laws and penalties for criminal conduct" (citation omitted)); *Sharma v. Garland*, 9 F.4th 1052, 1067 (9th Cir. 2021) (harm not rising to the level of persecution "necessarily falls short of the definition of torture"). The regulations implementing the CAT specifically provide that "[t]orture does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions." 8 C.F.R. § 1208.18(a)(3). The regulations further define "lawful sanctions" as "judicially imposed sanctions and other enforcement actions authorized by law, including the death penalty." *Id.* This does not give foreign countries unfettered discretion to avoid the CAT because the definition of "lawful sanctions" does not include actions "that defeat the object and purpose of the Convention Against Torture to prohibit torture." *Id.* That is, "[a] government cannot exempt torturous acts from CAT's prohibition merely by authorizing them as permissible forms of punishment in its domestic law." *Nuru v. Gonzalez*, 404 F.3d 1207, 1221 (9th Cir. 2005); *see Khouzam v. Ashcroft*, 361 F.3d 161, 169–70 (2d

Cir. 2004) ("It would totally eviscerate the CAT to hold that once someone is accused of a crime[,] it is a legal impossibility for any abuse inflicted on that person to constitute torture."). But a country's decision to prosecute certain crimes more aggressively or impose more severe punishments than the United States has chosen to impose does not necessarily establish torture. *See Li v. Holder*, 559 F.3d 1096, 1108–09 (9th Cir. 2009) (holding that absent a showing of "disproportionately severe punishment" or "pretextual prosecution," criminal prosecution does not constitute persecution (citation omitted)); *Fisher v. INS*, 79 F.3d 955, 961–62 (9th Cir. 1996) (en banc) (concluding that enforcement of Iran's "dress and conduct rules," although "harsh by Western standards," does not constitute persecution).

Here, South Korea's extraterritorial-jurisdiction law, allowing it to re-prosecute its citizens for crimes committed and punished outside of South Korea, is not inherently torturous. Nor is there any evidence that South Korea would apply its law more harshly to Park than to someone else similarly situated to him. Additionally, the agency properly found that the possibility that South Korea *may* prosecute Park and impose harsh punishment for his California drug crimes is entirely speculative. Pointing to South Korea's criminal law, Park argues that "nothing precludes the South Korean government from sentencing [him] to twenty years, life, life imprisonment with labor, or even the death penalty for possession for sale of cocaine." But Park has not shown that any of these outcomes are likely. South Korean law provides that the government *could* invoke extraterritorial jurisdiction to prosecute Park for the crimes he committed in

California,[4] and, if convicted, that he *could* receive a range of sentences from 10 years' imprisonment to the death penalty.[5] However, South Korean law specifically provides that if "an offender has undergone execution of a sentence imposed abroad because of a crime . . . the punishment therefor [*sic*] in Korea may be mitigated or remitted."[6] This makes Park's theory of torture based on his drug convictions a chain of speculative and unsubstantiated hypotheticals: the South Korean government would (1) have to learn of Park's California convictions, (2) choose to prosecute him for those crimes, (3) obtain a conviction, and (4) exercise its discretion to impose the life imprisonment or death sentence that he fears. *See Medina-Rodriguez v. Barr*, 979 F.3d 738, 750–51 (9th Cir. 2020) (concluding that "[t]he evidence does not establish that any step in this hypothetical chain of events is more likely than not to happen, let alone that the entire chain will come together to result in the probability of torture" (alteration in original) (citation omitted)).

Still, Park contends that the South Korean government "will likely single him out" based on his "criminal status." But Park himself testified that he was "not sure" how South Korea would learn of his California convictions. And he does not identify a single example where the South Korean

---

[4]*See* Criminal Act, Act No. 11731, Apr. 5, 2013, arts. 3 & 7, (S. Kor.), *translated in* Korean Legislation Research Institute online database, https://elaw.klri.re.kr/eng_service/lawView.do?hseq=28627&lang=ENG [https://perma.cc/2WUM-N9BE].

[5]*See* Narcotics Control Act, Act. No. 14019, Feb. 3, 2016, art. 58(1)–(2), (S. Kor.), *translated in* Korean Legislation Research Institute online database, https://elaw.klri.re.kr/eng_service/lawView.do?hseq=37716&lang=ENG [https://perma.cc/X4K2-DC5X].

[6]Criminal Act, Act No. 11731, *supra*, art. 7.

government has prosecuted someone for crimes that they were convicted of and punished for abroad. Park's strongest evidence is a 2018 news article hypothesizing that South Korea *might* prosecute the thousands of Korean students studying in Canada for smoking marijuana when they return to South Korea. But the article notes that exactly "how police would test those returning from Canada remain[s] hazy." And while "[e]xperts suggested enforcement would focus more on drug traffickers than casual users," the article also notes that "police are more concerned with the transportation of marijuana *into* South Korea." Otherwise, Park relies only on unsubstantiated hearsay from former South Korean residents who say that he could be re-prosecuted and punished for his California crimes. This record does not compel the conclusion that South Korea will single out Park or punish him in the manner that he fears, let alone torture him because of his criminal record. *See Blandino-Medina v. Holder*, 712 F.3d 1338, 1348 (9th Cir. 2013) (holding that agency properly denied CAT protection where petitioner "merely presented a series of worst-case scenarios").

### ii. Military Conscription

The agency's determination that Park will not be tortured under South Korea's military-conscription policy is also supported by substantial evidence. Like Park's fear of torture based on his criminal record, the harm he fears from mandatory military service is "inherent in or incidental to" generally applicable South Korean law. *See* 8 C.F.R. § 1208.18(a)(3). The news articles that Park submitted to the agency demonstrate that some members of the South Korean military have had tragic experiences, including mistreatment and suicide. But as with other legal requirements and policies, military conscription and punishment for evasion of military duty seldom constitute torture. *Cf. Zehatye v.*

*Gonzales*, 453 F.3d 1182, 1187 (9th Cir. 2006) ("[F]orced conscription or punishment for evasion of military duty generally does not constitute persecution."). And the record evidence does not establish that South Korea's decades-old conscription policy, which applies equally to all male citizens within the designated age range, is imposed "with the intent of inflicting pain and suffering." *Deng Chol v. Garland*, 25 F.4th 1063, 1070 (8th Cir. 2022) ("[C]onscription itself does not qualify as CAT torture unless done with the intent of inflicting pain and suffering on the conscript."); *see* 8 C.F.R. § 1208.18(a)(1). The same is true of South Korea's alternative to military conscription—three years of labor—which is equally available to anyone who wishes to avoid military service.

Park also has not met his burden to show that he would face a particularized risk of mistreatment from military conscription as a "cultural outsider." Because he is an "American-identifying South Korea expatriate" who has not lived in South Korea since he was young, Park argues that he "faces unique risks." But he also was "not sure" what would happen if he were required to join the military. The evidence of "endemic bullying" and abuse by officers, isolation from the loss of internet and phone access, and the suicide rate among military members does not establish that these impacts affect expatriates more than other conscripts. Instead, there is evidence in the record showing that expatriates and dual citizens have completed their military service unharmed. In sum, while there is evidence of mistreatment within the South Korean military, we cannot conclude that the record compels the conclusion that the approximately 600,000 people currently serving in the South Korean military are being subject to *torture* or that Park

would face a particularized risk of any level of mistreatment because he is an expatriate.

Finally, the agency did not fail to consider the aggregate impact of Park's claimed risks of torture. There is no indication that the BIA failed to "tak[e] into account all possible sources of torture" where it expressly referenced both theories. *Velasquez-Samayoa*, 49 F.4th at 1154 (citation omitted). Rather, it concluded that Park had not established that *any* of the mistreatment he fears "regardless of the basis" rose to the level of torture. The agency "said enough to convince us that it did, in fact, find that there is less than a 50% chance that [Park] will be tortured by all potential sources of torture . . . in the aggregate." *Iraheta-Martinez v. Garland*, 12 F.4th 942, 960 (9th Cir. 2021).

**PETITION DENIED.**[7]

---

[7] Park's motion to extend the time to file a reply in support of his motion for stay of removal (Dkt. No. 13) is granted, and his motion for stay of removal (Dkt. No. 1) is denied.